AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**5/8/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT

**5/8/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ER _____ DEPUTY

United States of America

v.

Roberto Carlos Aguilar,

Defendant.

Case No.   2:25-MJ-02772-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, Joseph B. Carelli, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date of February 18, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1959(a)(1) | Murder in Aid of Racketeering |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Joseph B. Carelli, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   May 8, 2025

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA: Shawn T. Andrews x6104

## AFFIDAVIT

I, Joseph B. Carelli, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against ROBERTO CARLOS AGUILAR, ("AGUILAR"), charging him with violating Title 18, United States Code, Section 1959(a)(1), Murder in Aid of Racketeering.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND OF SPECIAL AGENT JOSEPH B. CARELLI

3.    I am a Special Agent ("SA") with the FBI and have been so employed since October 2019.  I received basic law enforcement training at the FBI Academy in Quantico, Virginia from October 2019 to March 2020.  This training included segments on criminal law, various law enforcement skills, conducting criminal investigations, and other law enforcement topics.

4.    From approximately April 2020 to January 2025, I was assigned to the Los Angeles Metropolitan Task Force on Violent

Gangs (the "Task Force"), a multi-agency task force led by the FBI, which includes the Los Angeles Police Department ("LAPD") and the Los Angeles County Sheriff's Department ("LASD"), where I focused on investigation of MS-13, a criminal street gang. Since January 2025, I have been assigned to the Los Angeles Violent Crime Task Force.

5.    During my tenure with the FBI, I have participated in numerous investigations of large-scale street gangs and criminal enterprises.  I have investigated violations of both state and federal law, including violations relating to racketeering, violent crime, firearms, and narcotics.  I have interviewed numerous gang members, cooperating subjects, and confidential human sources.  I have become familiar with the methods, language, structures, and criminal activities, including firearms and narcotics trafficking, of street gangs and transnational organized crime groups operating in and through this judicial district.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.    On February 18, 2025, victim H.B. ("H.B.") – who was a cooperating defendant in a MS-13-related racketeering case pending in the Central District of California – was shot dead by two assailants at a grocery store in South Los Angeles.  Since H.B.'s status as a government cooperator was well-known by MS-13, H.B. was subject to a "green light" order that made him a target for murder by MS-13 members.

7.    Approximately an hour before H.B. was killed, he had what appears to be a chance encounter with AGUILAR – a member of

2

the Centrales clique of MS-13 in Los Angeles – inside the above-noted grocery store.  Following that encounter, AGUILAR set in motion a series of events that led to H.B.'s death.  By actively facilitating H.B.'s murder, AGUILAR either avoided discipline by or enhanced his status within MS-13.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    **Background of MS-13**

8.    Mara Salvatrucha was formed in Los Angeles in the mid-1980s and has been active ever since.  Mara Salvatrucha is a trans-national gang with members in at least ten states and several Central American countries, including El Salvador, Honduras, and Guatemala.  Mara Salvatrucha has a particular culture, as evidenced by the use of hand signals, tattoos related to devil's horns, the words "Mara Salvatrucha" or "MS-13," and tagging practices, all of which demonstrate individuals' association with, and membership in, the gang.

9.    In the 1990s in Los Angeles, Mara Salvatrucha distinguished itself by committing brutal acts of violence against rival gang members and non-gang members.  In the mid-1990s, Mara Salvatrucha became associated with the Mexican Mafia, commonly referred to as "la Eme" (which translates in English to "the M"), and added the number "13" to its name.  The number "13" marks the 13th letter of the alphabet: "M."  Thus, "Mara Salvatrucha" became "MS-13," signifying its loyalty to the Mexican Mafia.  MS-13 must pay extortionate rent payments to the Mexican Mafia, to which MS-13 swears fealty.

10.   The Mexican Mafia is a criminal organization that operates within the California state prison system, the federal prison system, and the streets and suburbs of large cities throughout Southern California.  By controlling the criminal activities occurring within prison facilities, providing protection for imprisoned members and associates of Hispanic gangs, and imposing discipline, often in the form of acts of violence, against both individuals and street gangs who fail to adhere to its directives, the Mexican Mafia rose to the position where it exercised control over Hispanic street gangs operating throughout the State of California.  Specifically, its individual members control one or more Hispanic street gangs, which serve as the power base through which the Mexican Mafia members operate their individual criminal enterprises.  In return for its integration into the Mexican Mafia, MS-13 members received the Mexican Mafia's protection in neighborhoods and in prison.

11.   While MS-13 originated in Los Angeles, over the years, MS-13's ranks increased dramatically as its members were deported to El Salvador.  The Salvadoran civil war left El Salvador's civilian population uneasy and mistrustful of the new government, making room for anti-establishment groups, including MS-13.  As MS-13's numbers swelled in Los Angeles and El Salvador, MS-13 members also traveled to, and settled in, other cities and areas in the United States, including New York, Virginia, Maryland, and Texas.  As a result, MS-13 operates nationally and internationally, with more than ten thousand

members regularly conducting gang activities in at least ten states and Washington, D.C., with tens of thousands more conducting gang activities in El Salvador, Honduras, Guatemala, and Mexico.

12. In Los Angeles, MS-13 operates under the "Los Angeles Program," whereby its Los Angeles-based leaders and members make decisions concerning how and when a new member is initiated into MS-13, how MS-13 operates, when discipline is meted out, when a subgroup or "clique" is responsible for paying extortionate rent payments, the geographical boundaries of each clique, and the identity of the shot-callers and leaders.

13. MS-13 in Los Angeles operates through subsets known as "cliques," which were usually named for a street within a clique's territory, or for the neighborhood in which the clique operates. MS-13 has approximately 20 cliques operating in Los Angeles, including, but not limited to, "7-11," "Adams," "Centrales," "Coronado," "Francis," "Fulton," "Harvard," "Hollywood," "Leeward," "Normandie," "Park View," "Pasadena," "Southside," "Tiny Winos," and "Bagos." Each clique typically has had one or more leaders at any given point, commonly referred to as "shot-callers," who are responsible for, among other things, managing the drug trafficking operation in the clique's territory, collecting extortion payments, authorizing or approving violence including murder, directing the day-to-day management of the clique, enforcing MS-13's and the Mexican Mafia's codes of conduct, resolving intra-clique disputes, and representing their respective cliques at the MS-13 general

meetings.  Shot-callers are also responsible for meeting with other clique leaders in order to achieve their common criminal purposes and to resolve disputes between the cliques.

14.  MS-13 claims territory throughout the City and County of Los Angeles.  Historically and currently, MS-13's territorial strongholds are the geographical areas encompassing the LAPD's Rampart Division, the Koreatown neighborhood, Hollywood, and parts of the San Fernando Valley, including North Hollywood and Van Nuys.  MS-13 members write or paint graffiti in the areas which they control to identify the area as controlled by MS-13.

15.  In Los Angeles, a clique adds new members through an initiation ritual known as "jumping in," during which several existing MS-13 members beat up a prospective MS-13 member while the shot-caller counts aloud for a count of 13.  In order for an individual to be jumped into a clique, they have to "put in work" for the clique, which can include robbery, extortion, kidnapping, drug sales, and murder, especially of members of MS-13 rival gangs such as the 18th Street criminal street gang, the Crazy Riders criminal street gang, and Florencia 13 criminal street gang.  Once "jumped in," members are expected to continue to participate in the full range of MS-13's criminal activities.

16.  MS-13 has zero tolerance for members and associates who cooperate with law enforcement.  Once MS-13 has evidence that someone has cooperated with law enforcement, by reputation, word of mouth, or by receiving and reviewing law enforcement reports or videos of interviews, MS-13 will commonly issue a "green light" on that person, which is an order that requires

any MS-13 member to kill the "green-lit" person on sight.  When MS-13 members carry out "green light" orders, it is common that their position in the enterprise is increased; for instance, they could be promoted into leadership positions in the gang. Conversely, if an MS-13 member fails to carry out a "green light" order despite the chance to do so, that member will almost certainly face discipline by or expulsion from the gang.

17.  While all MS-13 members have a responsibility to carry out "green light" orders, special responsibility for those orders falls on the clique to which the cooperator belonged.  If possible, then, an MS-13 member who finds someone who has been "green lit," should make an effort to notify members of the cooperator's former clique to let them carry out the murder.

**B.    Background of MS-13 Leadership Investigation**

18.  On November 8, 2023, a Federal Grand Jury sitting in the Central District of California returned a 36-count indictment captioned as 23-CR-545-AB, <u>United States v. Hurtado, et al.</u>  A copy of that indictment is filed concurrently as Exhibit 1 (hereinafter the "Indictment") and its allegations are incorporated herein.  Then, on December 11, 2024, a Federal Grand Jury sitting in the Central District of California returned a 28-count superseding indictment in the same case that is now captioned as 23-CR-545(A)-AB, <u>United States v. Grijalva, et al.</u>  A copy of that indictment is filed concurrently as Exhibit 2 (hereinafter the "Superseding Indictment") and its allegations are incorporated herein.

19. In substance and summary, the Indictment and Superseding Indictment describe a multi-year conspiracy to conduct the MS-13 gang in Los Angeles as a racketeering enterprise engaged in large-scale drug distribution, acts of violence including attempted murder, and illegal gun sales. The Indictment and Superseding Indictment also describe how an incarcerated member of the Mexican Mafia (stylized in those documents and herein as the "MS-13 Inmate") controlled the racketeering enterprise and imposed a rule on the gang that required each Los Angeles-based MS-13 clique to distribute methamphetamine, with some of the profits of that distribution flowing to the MS-13 Inmate.[1]

20. Several of the defendants charged in the Indictment and Superseding Indictment – including Cooperating Witness 1 ("CW-1"), Cooperating Witness 2 ("CW-2"), and H.B. – pleaded guilty pursuant to cooperation plea agreements that obligate them to supply truthful information to the government, including via testimony at trial. H.B. was under the same obligation before his death.

21. H.B. pleaded guilty on March 6, 2024. According to CW-1 (who remained in communication with other MS-13 members

---

[1] Many of the facts that support the allegations contained in the Indictment and Superseding Indictment were developed through the Task Force's use of a confidential source who is stylized as "CI-1" in those documents and is referred to as such herein. CI-1 has an arrest in the United States in November 2011 for entry without inspection, and a conviction in El Salvador from 2003 for possession of stolen goods. CI-1 is cooperating with the FBI for immigration benefits and monetary compensation and has been paid approximately $152,898.72 to date.

before he/she pleaded guilty in 2025), H.B. was widely considered in MS-13 circles to be a government cooperator, and, as such, was "green-lit," by MS-13. Accordingly, any MS-13 member who encountered H.B. was under an obligation to kill him.

**C. February 18, 2025, Murder of H.B.**

22. At approximately 8:10 p.m. on February 18, 2025, I received a call from H.B. on my FBI-issued cellular telephone.[2] When I answered the call, H.B. told me (in substance and summary):

a. he was at a grocery store on 91st Street in Los Angeles where MS-13 members had just tried to kill him;

b. he had been talking with MS-13 members when a male individual whose face was covered approached and tried to shoot H.B., but the gun did not fire;

c. one of the MS-13 members H.B. was talking to was from his clique (which I know from proffer sessions with H.B. to be the Bagos clique) and another male individual was from the Centrales clique;

d. the male individual from the Centrales clique went by the moniker "Desente," or "Inocente;" and

e. during one of our previous proffer sessions, I had shown H.B. a picture of the individual who went by the moniker "Desente," or "Inocente."

---

[2] As part of my work as the lead case agent in the prosecutions stemming from the Indictment and Superseding Indictment, I provided my FBI-issued cellular telephone number to H.B. One reason I provided that number was so H.B. could call me if he ever believed he was in danger.

23.   Then, I heard through the telephone several gunshots and H.B. stopped responding to me.  Soon after, I heard what sounded like police and emergency medical services arriving at H.B.'s location.  Ultimately, I discovered that H.B. had been shot and killed at the Superior Grocers located at 9127 South Figueroa Street in Los Angeles (the "Superior Grocers"). Superior Grocers is located on South Figueroa Street ("South Figueroa") between West 91st Street ("91st Street") and West 92nd Street ("92nd Street") in South Los Angeles as depicted on the map below:



24.   Later, I learned that before H.B. called me at approximately 8:10 p.m., he called 911 at approximately 8:03 p.m.  I listened to the recording of that 911 call and discovered that H.B. told the 911 operator (in substance and summary):

        a.   he was at "91st and Figueroa," and there was a man with a pistol;

b.    the man with the pistol was walking on "91st toward Hoover;"

c.    the man who had the pistol was about 20 years old, dressed in all black, with a handkerchief covering his face; and

d.    the man with the pistol was with another man, who was Latino, had long hair, and was wearing a black top and blue jeans.

**D.    Identification of AGUILAR**

25.    On February 19, 2025, I reached out to CW-2 (who is a former Centrales clique member) in an effort to determine whether CW-2 could help identify the person who H.B. described as a Centrales clique member who went by the moniker "Desente," or "Inocente."  During that conversation, CW-2 informed me that s/he knew a member of the Centrales clique who went by the moniker "Desente," and who had joined the gang in approximately June or July of 2023.  CW-2 described "Desente," as "chunky," with a "white," complexion and long hair.

26.    Then, I reviewed reports from the proffer sessions held with H.B. and found that on January 19, 2024, I showed H.B. photographs of various individuals that law enforcement believed to be MS-13 members.  One of the photographs I showed H.B. was captured during a Task Force surveillance operation of a

memorial service for an MS-13 member that took place in Los Angeles on September 9, 2023:[3]



Centrales

The writing below the photograph above is H.B.'s.  H.B. identified the person depicted in the photograph as a member of the Centrales clique, but he did not identify the person by his moniker.  The person in the photograph, however, matched the description provided previously by CW-2 of "Desente," from the Centrales clique.

---

[3] CI-1 attended this memorial service at the direction of the Task Force and wore an audio/visual recording device while there.  I also discussed the memorial service with CW-2 and showed s/he photographs that the Task Force captured during its surveillance of the memorial service.  Based on my review of the footage captured by CI-1's recording device and my conversations with CI-1 and CW-2, I know that many active MS-13 members attended the memorial service.

27.  I located two additional photographs of that individual captured during the Task Force surveillance operation on September 9, 2023:





Image File Name: Subject.1.JPG



Image File Name: Subject.2.JPG

On or about February 21, 2025, those photographs were submitted to the FBI Criminal Justice Information Service, Face Operations Services ("FOS") so FOS could run face recognition software on those photographs.  Later, I learned that when FOS ran face recognition software on those photographs, the software returned the following information:

## Returned Information



Source: NGI
Type: Likely Candidate
Unique Identifier: DK0W9C5KT
Name: DOE, JOHN

28. FBI personnel ran the "Unique Identifier," above (which is an FBI Number) through the National Crime Information Center database and learned that the FBI Number is associated with AGUILAR. Then, FBI personnel were able to locate an additional mugshot of AGUILAR from what appears to be the same arrest:



29.  On February 21, 2025, I showed both CW-1 and CI-1 the mugshot above, and they both identified the person depicted in that photograph as "Desente," from the Centrales clique.  Then, CW-1 provided me with the phone number that he believed belonged to "Desente," from the Centrales clique: 562-500-3341 (the "3341 Number").  On or about February 24, 2025, a Los Angeles Police Department detective obtained a California state search warrant that required T-Mobile to provide law enforcement with information associated with that phone number including subscriber information, call detail records, cellular site location, and timing advance data.  I reviewed the subscriber information produced by T-Mobile pursuant to that warrant and discovered that the 3341 Number was subscribed to "Roberto Carlosaguilar," at an address in Los Angeles.

**E.   AGUILAR Facilitated H.B.'s Murder**

30.  In the wake of H.B.'s murder, law enforcement gathered video footage captured from: 1) surveillance cameras mounted inside the Superior Grocers, 2) LAPD pole cameras mounted in the neighborhood around the Superior Grocers, and 3) private security cameras mounted in the neighborhood around the Superior Grocers.  Additionally, I obtained the location monitoring data captured by the ankle bracelet monitoring device H.B. was wearing at the time of his murder pursuant to the conditions of his pretrial release.  Based on a review of those pieces of evidence and the data obtained from T-Mobile for the 3341 Number, I discovered the following:

a.    At approximately 7:14 p.m., H.B. drove into the parking lot of the Superior Grocer in a white sedan which was followed closely by a black SUV (the "Black SUV").  After the Black SUV parked, three men exited the car and walked toward the grocery store:[4]



At approximately 7:15 p.m., the 3341 Number began to interact with a cellular telephone tower located near the intersection of South Figueroa and 92nd Street, which is approximately one block south of the Superior Grocers.  The 3341 Number continued to interact with that same tower until approximately 7:32 p.m.

b.    At approximately 7:15 p.m., the three men who exited from the Black SUV entered the Superior Grocers:

---

[4] H.B. parked his car closer to the entrance of the Superior Grocer and that parking spot is not captured by any of the video footage that has been located by law enforcement to date.



Among that group of three men was a man who appears to be AGUILAR:



       c.    After AGUILAR and his two compatriots entered the grocery store, they began shopping for vegetables in the produce section.  Then, at approximately 7:21 p.m., H.B. entered the Superior Grocers:



       d.    Approximately two minutes later, AGUILAR and his two compatriots crossed paths with H.B. toward the rear of the produce section where they appeared to exchange greetings:



e.    Following that interaction, at approximately 7:25 p.m., AGUILAR walked away from his two compatriots toward the registers at the front of the store.  Once he was near the registers, he began using his telephone and appeared to be making calls:[5]

 

---

[5] The call detail records from the 3341 Number do not show any calls being made at this time.  I know based on my experience investigating MS-13 in Los Angeles, however, that MS-13 members in Los Angeles often communicate using the encrypted Internet messaging application WhatsApp.  In fact, during a recorded telephone call that took place between CI-1 and the MS-13 Inmate on or about July 6, 2021, the MS-13 Inmate advised CI-1 to use WhatsApp because "it's the safest line."  Furthermore, CW-1, CW-2, and H.B. confirmed during proffer sessions that MS-13 members in Los Angeles communicated frequently using WhatsApp.  Communication via WhatsApp would not be captured in call detail records.

f.   Less than a minute later, AGUILAR headed toward the exit of the store, and it appears he was closely monitoring his telephone:

 

g.   Moments after AGUILAR exited the store, he approached the Black SUV and began to loiter.  AGUILAR remained near the Black SUV for several minutes when he was joined by his two compatriots.  Those men remained with AGUILAR briefly, but then entered the Black SUV and drove away, leaving AGUILAR behind.

h.   After the Black SUV drove out of the parking lot, at approximately 7:32 p.m., H.B. exited the Superior Grocers toward the parking lot.  At the same time H.B. exited the store, AGUILAR walked away from the back of the parking lot toward the front of the store where H.B. was walking toward the parking lot.  Then, AGUILAR and H.B. appeared to meet near the front of the parking lot where they remained for approximately the next 30 minutes.

31.  Additionally, during this time, the call detail records for the 3341 Number show that it received two calls from the same telephone number: 571-603-8165 (the "8165 Number"). The first call took place at 7:50 p.m., the second took place at 7:55 p.m., and both calls went to voicemail.  I obtained subscriber information for the 8165 Number via administrative subpoena and discovered that it was subscribed to "Iris M. Urias," at an address on Clara Street in Cudahy, California (the "Cudahy Address").  Then, using law enforcement databases, I learned that D.A.U. provided the Cudahy Address to Glendale Police Department ("GPD") officers when he was arrested in Glendale on or about January 6, 2025.  D.A.U. is a member of the Bagos clique of MS-13 in Los Angeles.  The photograph below was captured following an arrest of D.A.U. that took place on or about March 11, 2025:



32.   On or about March 3, 2025, a LAPD detective obtained a California state search warrant that required T-Mobile to provide law enforcement with information associated with the 8165 Number, including cellular site location and timing advance data.  Based on a review of that data, law enforcement reports, law enforcement body-worn camera footage, and the video surveillance footage described in paragraph 30 above, I know the following:

a.    At approximately 7:31 p.m., the 8165 Number was interacting with a cellular telephone tower located near the intersection of New Hampshire Avenue and West 8th Street in Los Angeles, approximately nine miles north of the Superior Grocers. Later, at approximately 7:38 p.m., the 8165 Number interacted with a tower located near the intersection of Vermont Avenue and Venice Boulevard, approximately eight miles north of the Superior Grocers.  Then, for the two calls described above in paragraph 31 that took place at 7:50 p.m. and 7:55 p.m., the 8165 Number interacted with the tower located near the intersection of South Figueroa and 92nd Street (the same tower used by the 3341 Number between 7:15 p.m. and 7:32 p.m.).[6]

b.    During the above-noted GPD arrest of D.A.U. on January 6, 2025, D.A.U. was the driver of a car that led police on a brief pursuit and G.Z.S. was a passenger in that car.  On January 29, 2025, LAPD officers conducted a traffic stop on a grey Honda CRV in which G.Z.S. was the driver.  I watched the

---

[6] When the 8165 Number called the 3341 Number at these times, the 3341 also interacted with the tower located near the intersection of South Figueroa and 92nd Street.

body-worn video footage captured during that traffic stop and saw that when the officers asked G.Z.S. about who the car belonged to, G.Z.S. said (in substance and summary), that he had bought the car the week prior from a buyer who listed it on Facebook.  G.Z.S. is a member of the Bagos clique of MS-13 in Los Angeles.  The photographs below were captured following an arrest of G.Z.S. that took place on or about March 11, 2025:

 



c.    At approximately 7:51 p.m., a grey Honda CR-V (the "CR-V") turned left on South Figueroa from 92nd Street, drove north, and parked on the east curb of South Figueroa near the intersection of West 91st Place ("91st Place"), directly opposite the Superior Grocers:[7]

 

The CRV remained parked in that location for approximately four minutes. Then, it pulled away from the curb at approximately 7:55 p.m., drove north, and turned right on 91st Street:



---

[7] In the surveillance video footage from February 18, 2025, the CR-V appeared to have a dent in its rear left quarter panel. The grey CRV G.Z.S. was driving on January 29, 2025, also had a dent in its rear left quarter panel.

d.    At approximately 7:59 p.m., a man walked west on 91st Place to the intersection with South Figueroa, then crossed South Figueroa toward the Superior Grocers:

 

e.    At approximately 8:01 p.m., shortly after that man crossed South Figueroa, the CRV drove west on 91st Place, turned right on South Figueroa and drove north, then turned left onto 91st Street (immediately north of the parking lot of the Superior Grocers):

 

Then, the CRV drove west on 91st Street and proceeded toward South Hoover Street:



        f.    At approximately 8:03 p.m., AGUILAR and another man (who appeared to be wearing black pants, a black shirt, a black mask, and a grey hat – "Subject 1") quickly walked north

//

//

//

26

through the Superior Grocers parking lot, exited through the
parking lot's north entrance, then proceeded west on 91st
Street:



AGUILAR and Subject 1 continued to walk west quickly on 91st
Street toward South Hoover Street (in the same direction the CRV
traveled moments before):[8]




---

[8] It appears that AGUILAR (on the left, above) removed the
sweatshirt he had been wearing inside the Superior Grocers,
exposing the red shirt he was wearing underneath.

g.    As noted above, at approximately 8:03 p.m. (in
the immediate wake of AGUILAR and Subject 1 appearing to flee
from the Superior Grocers), H.B. made the above-described 911
call.  He appears to have made this call while inside the
Superior Grocers, where surveillance camera footage captured him
at the entrance to the store holding his phone at approximately
that time:



H.B. remained in or around the front of the store from
approximately 8:03 p.m. until he was shot dead at approximately
8:14 p.m.

h.    As H.B. stood in or near the front of the
Superior Grocers, the CRV continued to circle the area:

i.    at approximately 8:04 p.m., it drove south
on South Figueroa, past 91st Street, past the Superior Grocers,
and past the intersection of South Figueroa and 92nd Street;

   ii.  at approximately 8:05 p.m., it drove north on South Figueroa, past 92nd Street toward the Superior Grocer where it appeared to make a U-turn and then proceeded east on 91st Place;

   iii. at approximately 8:08 p.m., it drove west on 91st Street toward South Hoover Avenue;[9]

   iv.  at approximately 8:10 p.m., it turned left onto South Figueroa from 92nd Street, drove north to the intersection of South Figueroa and 91st Place and parked on the curb directly opposite the Superior Grocer:[10]



   v.  the CRV remained in that position for approximately three minutes before it drove north on South

//

---

  [9] At approximately this time, the 3341 Number interacted with cellular telephone towers near the intersection of South Hoover Avenue and Colden Avenue, approximately a quarter mile southwest of the Superior Grocers.

  [10] From this vantage point, it is possible that the occupants of the CRV would have been able to see the area just outside of the entrance of the Superior Grocers.  At approximately this time, H.B. emerged from the inside of the Superior Grocers and stood just outside of the entrance, potentially exposing himself to the view of the occupants of the CRV.

Figueroa, turned left on 91st Street, drove midway down the block, executed a multipoint turn to change direction, then proceeded back to South Figueroa and turned right:

 

   vi. at approximately 8:14 p.m., the CRV stopped directly in front of the Superior Grocer on the west curb of South Figueroa Street and one of the passenger doors opened:



33.    A few moments later, but also at 8:14 p.m., two men (including one who appears to be Subject 1) ran inside the grocery store and shot H.B. dead:



34.    At approximately 8:15 p.m., the passenger side door of the CRV closed and the CRV drove at a high rate of speed south on South Figueroa, then turned right on West 92nd Street.

**F.    Bagos Clique Shotcaller Discusses H.B.'s Murder**

35.    On February 21, 2025, I instructed CW-1 to place a recorded call via WhatsApp to A.R. who CW-1 identified as the shotcaller of the Bagos clique of MS-13 in Los Angeles.  During that call, A.R. and CW-1 discussed the recent murder of H.B.  In substance and summary, A.R. told CW-1 that H.B.'s murder was going to happen sooner or later because H.B. was cooperating

with law enforcement.  Then, A.R. told CW-1 "they told me I had
to clean out my garbage, you understand, and well that work you
cannot say no to."

## V.  <u>CONCLUSION</u>

36.  For all the reasons described above, there is probable
cause to believe that defendant has committed a
violation of Title 18, United States Code, Section 1959(a)(1),
Murder in Aid of Racketeering.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 8th day of May
2025.


_Rozella a. Oli_
HON. ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

```
                                        ┌─────────────────────────┐
                                        │          FILED          │
                                        │ CLERK, U.S. DISTRICT COURT │
                                        │                         │
                                        │      11/8/2023          │
                                        │                         │
                                        │ CENTRAL DISTRICT OF CALIFORNIA │
                                        │ BY:        JB      DEPUTY │
                                        └─────────────────────────┘
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No.  2:23-cr-00545-AB |
| Plaintiff, | I N D I C T M E N T |
| v. | [21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute and to Distribute Methamphetamine; 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine; 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition; 21 U.S.C. § 853, 18 U.S.C. § 924(d)(1), and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| PAVEL HURTADO, aka "Temper," ELI GRIJALVA, aka "Skinny," HERLYN BARRIENTOS, aka "Doctorazo," CESAR SARAVIA, aka "Sleepy," aka "Washington," PEDRO VALLADARES, aka "Psycho," ELMER LINARES, aka "Macabro," ORLANDO OLIVAR-MARTINEZ, aka "Tacuba," CARLOS TORRES-MIRANDA, aka "Estricto," aka "Malaspecto," JUAN ARRONIZ, aka "Tiny," EDER GOMEZ-MEJIA, aka "Huero," CHRISTOPHER MARTIR, aka "Insolente," AMILCAR GONZALEZ, aka "Lunatico," AGUSTIN AQUINO-MARTINEZ, aka "Chino," | |
| JOSE REYES, | |

```
 1    aka "Husky,"
    JOSE ARREDONDO,
 2    aka "Misterio,"
    ANDERSON MENDOZA,
 3    aka "Cypher,"
    CLIDER GODINEZ-CAMPOS,
 4    aka "Jicli,"
    DOUGLAS TORRES,
 5    aka "Midnight,"
    CHRISTOPHER JACO-VILLALOBOS,
 6    aka "Clavo,"
    MARIA CHAVEZ,
 7    aka "Moana,"
    MARCO HERNANDEZ,
 8    aka "Clandestino,"
    RIQUELMY ABARCA,
 9    aka "Bago," and
    BYRON CHINCHILLA,
10    aka "Psycho,"

11          Defendants.
```

The Grand Jury charges:

### GENERAL ALLEGATIONS

At times relevant to this Indictment:

1.    Mara Salvatrucha was formed in Los Angeles, California in the mid-1980s by immigrants fleeing the civil war in El Salvador. Once in Los Angeles, they organized themselves into a group called Mara Salvatrucha, which was initially largely composed of Salvadoran immigrants.  "Mara" is a Central American term for gang.  "Salva" refers to El Salvador.  In the 1990s in Los Angeles, Mara Salvatrucha distinguished itself by committing brutal acts of violence against rival gang members and non-gang members.  In the mid-1990s, Mara Salvatrucha became associated with the Mexican Mafia, commonly referred to as "la Eme" (which translates in English to "the M"), and added the number "13" to its name.  The number "13" marks the 13th letter of the alphabet: "M."  Thus, Mara Salvatrucha became MS-13. While MS-13 originated in Los Angeles, over the years, MS-13 spread

2

as its members were deported to El Salvador and because its members traveled to other locations in the United States and abroad.  As a result, in addition to operating in Los Angeles, MS-13 operated nationally and internationally, with more than ten thousand members regularly conducting gang activities in at least ten states and Washington, D.C., and with thousands more conducting gang activities in Central America and Mexico.

2.   MS-13 in Los Angeles, and MS-13 nationally and internationally, was largely comprised of persons from Central America, including El Salvador, Honduras, and Guatemala.  Although each MS-13 locale had a common origin, MS-13 in Los Angeles operated differently in El Salvador, Honduras, Guatemala, and the other states within the United States.  Notwithstanding, clique names in other parts of the United States were named for existing cliques in Los Angeles.  At times, MS-13 members from other geographic locations traveled to Los Angeles to participate in leadership meetings; however, MS-13 in Los Angeles was independent and self-governing, and made its own decisions.  Conversely, MS-13 members in Los Angeles were sometimes called upon to provide input in other parts of the country.  Additionally, MS-13 members in Los Angeles trafficked narcotics from Los Angeles to other parts of the country.

3.   MS-13 operated through subsets known as "cliques," which were usually named for a street within a clique's territory, or for the neighborhood in which the clique operated.  MS-13 had approximately 20 cliques operating in Los Angeles, including, but not limited to, "Adams," "Centrales," "Coronados," "Francis," "Fulton," "Harvard," "Hollywood," "Leeward," "King Boulevard," "Molinos," "Normandie," "Parkview," "Southside," "Tiny Winos," "Travieso," and

"Vagos." Each clique typically had one or more leader at any given point, commonly referred to as "shot callers," who were responsible for, among other things, managing the narcotics trafficking operation in the clique's territory, collecting extortion payments, directing the day-to-day management of the clique, enforcing MS-13's and the Mexican Mafia's codes of conduct, resolving intra-clique disputes, and representing their respective cliques at the MS-13 general meetings.

4. One distinguishing feature about MS-13 in Los Angeles was that it was beholden to the Mexican Mafia, which was a criminal organization that united Hispanic gang members under a single alliance that operated within the California state prison system, the federal prison system, the streets and suburbs of large cities throughout Southern California, and elsewhere. Members of the Mexican Mafia, commonly referred to as a "Carnal," "Brother," "Big Homie," "Tio" (Spanish for "uncle"), and/or "Padrino" (Spanish for "godfather"), typically came from the ranks of local Southern California Hispanic street gangs, including MS-13. By controlling the criminal activities occurring within prison facilities, providing protection for imprisoned members and associates of Hispanic gangs, and imposing discipline, often in the form of acts of violence, against both individuals and street gangs who failed to adhere to its directives, the Mexican Mafia rose to the position where it exercised control over Hispanic street gangs operating throughout the State of California. Specifically, its individual members controlled one or more Hispanic street gangs, which served as the power base through which the Mexican Mafia members operated their individual criminal enterprises. In return for its integration into the Mexican Mafia,

4

1    MS-13 members received the Mexican Mafia's protection in the

2    neighborhoods and also in prison.

3         5.    Like all gangs associated with the Mexican Mafia in

4    California, MS-13 was required to pay a specified sum, commonly known

5    as "taxes" or "rent" on a regular basis to a member of the Mexican

6    Mafia.  In Los Angeles, each MS-13 clique or sub-set contributed a

7    portion of its profits, derived primarily from narcotics and drug

8    sales and extortion of street vendors, to the Mexican Mafia.  Each

9    member of an MS-13 clique, whether incarcerated or not, was expected

10   to contribute financially to their clique's rent payment.  In return

11   for the tax payments, the Mexican Mafia provided protection to all

12   MS-13 members incarcerated in county, state and federal prisons and

13   jails in California.  Additionally, and in exchange for the tax

14   payments, the Mexican Mafia allowed MS-13 to sell narcotics in its

15   territories.  Finally, the Mexican Mafia ensured that no other gang

16   operated in MS-13's territory or otherwise interfered with MS-13's

17   criminal activities.  Failure of MS-13 to pay its tax to the Mexican

18   Mafia would result in a "green light" on MS-13, that is, a general

19   order from the Mexican Mafia to assault or kill any incarcerated MS-

20   13 member in any facility controlled by the Mexican Mafia or outside

21   of prison facilities.  It was unlikely that MS-13 in Los Angeles

22   could continue to exist if it chose not to pay its taxes, tantamount

23   to extortion payments, to the Mexican Mafia.

24        6.    The Mexican Mafia invited some incarcerated MS-13 members

25   to join its leadership.  In this role, those MS-13 members who were

26   chosen to participate in managerial roles for the Mexican Mafia

27   completed various tasks, including, but not limited to, facilitating

28   the smuggling of narcotics into the prison facilities, carrying out

orders of discipline and/or determining who will carry out orders of discipline, representing the Mexican Mafia amongst other leaders of the prison/custodial facility, and ensuring that MS-13 members, and other Hispanic gang members under their control, followed the Mexican Mafia's code of conduct. Additionally, incarcerated MS-13 members could still actively participate in MS-13's activities outside of prisons, including contributing rent money to their respective cliques, hearing disputes between MS-13 members and cliques, determining and/or agreeing or disagreeing with punishment, and ordering discipline for violating the Mexican Mafia's and MS-13's codes of conduct. While incarcerated, MS-13 members followed the Mexican Mafia's code of conduct.

7.    MS-13's regular tax payments to the Mexican Mafia came from MS-13's cliques, who paid the tax on a monthly or yearly basis. MS-13 cliques obtained their payments from their individual members. MS-13's clique leaders were involved in the coordination of tax collection throughout the territory MS-13 controlled in Los Angeles. Additionally, each clique leader was responsible for collecting extortion, in the form of gang "dues," from each clique member in order to pay each clique's allotted monthly or yearly extortion payment to the Mexican Mafia. If a clique member did not pay his/her "dues" to the clique, the clique shot caller would "green light" the delinquent member and punishment would be meted out, usually by violence.

8.    In Los Angeles, MS-13 operated under the "Los Angeles Program," which was distinct from programs in El Salvador, Honduras, Guatemala, and other parts of the United States, whereby its leaders and members made all decisions concerning how and when a new person

became a member of MS-13, how MS-13 operated, when discipline was meted out, when a clique was responsible for paying its extortionate rent payments, the geographical boundaries of each clique, and the identity of the shot callers and leaders.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT ONE

[21 U.S.C. § 846]

[DEFENDANTS HURTADO, GRIJALVA, BARRIENTOS, SARAVIA, VALLADARES, LINARES, OLIVAR-MARTINEZ, TORRES-MIRANDA, ARRONIZ, GOMEZ-MEJIA, MARTIR, GONZALEZ, AQUINO-MARTINEZ, REYES, ARREDONDO, MENDOZA, GODINEZ-CAMPOS, TORRES, JACO-VILLALOBOS, CHAVEZ, HERNANDEZ, ABARCA, and CHINCHILLA]

Paragraphs 1 through 8 of the General Allegations of this Indictment are re-alleged and incorporated here.

A.   OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing to on or about November 8, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants PAVEL HURTADO, also known as ("aka") "Temper," ELI GRIJALVA, aka "Skinny," HERLYN BARRIENTOS, aka "Doctorazo," CESAR SARAVIA, aka "Sleepy," aka "Washington," PEDRO VALLADARES, aka "Psycho," ELMER LINARES, aka "Macabro," ORLANDO OLIVAR-MARTINEZ, aka "Tacuba," CARLOS TORRES-MIRANDA, aka "Estricto," aka "Malaspecto," JUAN ARRONIZ, aka "Tiny," EDER GOMEZ-MEJIA, aka "Huero," CHRISTOPHER MARTIR, aka "Insolente," AMILCAR GONZALEZ, aka "Lunatico," AGUSTIN AQUINO-MARTINEZ, aka "Chino," JOSE REYES, aka "Husky," JOSE ARREDONDO, aka "Misterio," ANDERSON MENDOZA, aka "Cypher," CLIDER GODINEZ-CAMPOS, aka "Jicli," DOUGLAS TORRES, aka "Midnight," CHRISTOPHER JACO-VILLALOBOS, aka "Clavo," MARIA CHAVEZ, aka "Moana," MARCO HERNANDEZ, aka "Clandestino," RIQUELMY ABARCA, aka "Bago," and BYRON CHINCHILLA, aka "Psycho," and others known and unknown to the Grand Jury, conspired with each other to knowingly and intentionally possess with intent to distribute, and distribute, at least 50 grams of methamphetamine, a

Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1.   An incarcerated MS-13 member who was also a member of the Mexican Mafia (the "MS-13 Inmate") would exercise control of MS-13 Los Angeles by imposing a rule on all MS-13 Los Angeles cliques that required them to buy methamphetamine for re-distribution from defendant BARRIENTOS, and others known and unknown to the Grand Jury, with some profits from that distribution flowing to the MS-13 Inmate.

2.   The MS-13 Inmate would designate certain MS-13 members, like defendants HURTADO and GRIJALVA, to be the overall shot caller for MS-13 Los Angeles.  As the overall shot caller, defendants HURTADO and GRIJALVA would oversee MS-13's drug trafficking activities and communicate with the MS-13 Inmate to coordinate drug trafficking activities for MS-13.

3.   MS-13 members would use violence and intimidation to control narcotics trafficking in territories controlled by MS-13. Narcotics sales would comprise the majority of revenue generated by MS-13.  In order to sell narcotics within MS-13's territory, one must either be an MS-13 member, an associate, or otherwise have permission from, and pay extortionate rent payments to, MS-13.

4.   MS-13 shot callers, including defendants SARAVIA, VALLADARES, LINARES, OLIVAR-MARTINEZ, TORRES-MIRANDA, ARRONIZ, GOMEZ-MEJIA, and GONZALEZ, and others known and unknown to the Grand Jury, would be responsible for the geographic territory under their

9

cliques' respective control.  Within a clique's geographic boundaries, that clique, as controlled by the shot caller, would have exclusive rights to distribute narcotics.  Additionally, shot callers would be responsible for collecting, from MS-13's general members, their clique's extortionate rent payments, the bulk of which would likely be comprised of narcotics profits and proceeds.

5.    Additionally, each clique member, including defendants REYES, ARREDONDO, MENDOZA, GODINEZ-CAMPOS, TORRES, JACO-VILLALOBOS, HERNANDEZ, ABARCA, and CHINCHILLA, and others known and unknown to the Grand Jury, would answer to the clique's respective shot caller and would be responsible for, among other things, protecting clique territory, marking or denoting clique territory by affixing graffiti to structures and public property located within clique territory, monitoring street corners for non-MS-13 member narcotics distributors, looking for ways to expand clique territory, and obtaining and maintaining firearms to aid in the protection of clique territory, all to ensure that his or her clique could exclusively distribute narcotics within clique territory.

6.    Each MS-13 member and associate, along with wholesale narcotics suppliers and street narcotics dealers, would receive authorization from the shot callers to traffic in controlled substances within individual clique territories, and in return, would be required to pay a portion of the drug proceeds, known as a "tax," to his or her respective MS-13 shot caller for the areas in which narcotics were trafficked.

7.    Defendants HURTADO, GRIJALVA, BARRIENTOS, SARAVIA, VALLADARES, LINARES, OLIVAR-MARTINEZ, TORRES-MIRANDA, ARRONIZ, GOMEZ-MEJIA, MARTIR, GONZALEZ, REYES, ARREDONDO, MENDOZA, GODINEZ-CAMPOS,

TORRES, JACO-VILLALOBOS, CHAVEZ, HERNANDEZ, ABARCA, and CHINCHILLA, and others known and unknown to the Grand Jury, would possess with intent to distribute, distribute, and facilitate the distribution of narcotics in the territories controlled by MS-13.

8.    The MS-13 Inmate would designate certain MS-13 members like defendant AQUINO-MARTINEZ to act as the treasurer for MS-13 Los Angeles.  As treasurer, defendant AQUINO-MARTINEZ coordinated the collection of the drug proceeds and "taxes" from each MS-13 Los Angeles clique and was responsible for forwarding those profits and taxes to the MS-13 Inmate.

C.   OVERT ACTS

On or about the following dates, in furtherance of the conspiracy, and to accomplish the objects of the conspiracy, defendants, and others known and unknown to the Grand Jury, committed various overt acts, within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:    On July 5, 2021, by telephone and text message using coded language, the MS-13 Inmate agreed to sell a confidential informant working at the direction of law enforcement ("CI-1") two pounds of methamphetamine for $3,000 and told CI-1 to obtain the methamphetamine from a co-conspirator and to deliver payment for the methamphetamine to defendant CHINCHILLA.

Overt Act No. 2:    On July 6, 2021, by telephone using coded language, the MS-13 Inmate told CI-1 that defendant CHINCHILLA was prepared to accept money on behalf of the MS-13 inmate for the sale of methamphetamine.

Overt Act No. 3:    On July 7, 2021, defendant CHINCHILLA accepted $3,000 from CI-1 as payment for CI-1's purchase of

approximately 786 grams of methamphetamine in a deal arranged by the MS-13 Inmate.

Overt Act No. 4:   On July 28, 2021, by telephone and text message using coded language, defendant CHINCHILLA agreed to accept payment on behalf of the MS-13 Inmate for the sale of methamphetamine.

Overt Act No. 5:   On July 28, 2021, defendant CHINCHILLA accepted $3,000 from CI-1 as payment for CI-1's purchase of approximately 863 grams of methamphetamine from a co-conspirator in a deal arranged by the MS-13 Inmate.

Overt Act No. 6:   On December 8, 2021, by telephone using coded language, defendant SARAVIA told CI-1 that he was prepared to sell two pounds of methamphetamine to CI-1 on behalf of the MS-13 Inmate.

Overt Act No. 7:   On December 8, 2021, defendant SARAVIA sold approximately 877 grams of methamphetamine to CI-1 for $3,000.

Overt Act No. 8:   On January 2, 2022, by text message using coded language, defendant HURTADO agreed to contact the MS-13 Inmate on behalf of CI-1 so CI-1 could discuss additional drug purchases with the MS-13 Inmate.

Overt Act No. 9:   On January 3, 2022, by telephone using coded language, defendant REYES told CI-1 that he was prepared to sell three pounds of methamphetamine to CI-1 on behalf of the MS-13 Inmate.

Overt Act No. 10:   On January 5, 2022, by telephone using coded language, defendant REYES agreed to meet CI-1 at a restaurant in Los Angeles to finalize the sale of three pounds of methamphetamine to CI-1.

1    <u>Overt Act No. 11:</u>   On January 6, 2022, defendant SARAVIA sold

2    approximately 1.31 kilograms of methamphetamine to CI-1 for $4,500.

3    <u>Overt Act No. 12:</u>   On February 23, 2022, by voice message using

4    coded language, defendant HURTADO agreed to contact the MS-13 Inmate

5    on behalf of CI-1 so CI-1 could discuss additional drug purchases

6    with the MS-13 Inmate.

7    <u>Overt Act No. 13:</u>   On February 23, 2022, by telephone using

8    coded language, the MS-13 Inmate agreed to sell two pounds of

9    methamphetamine to CI-1 and told CI-1 to obtain the methamphetamine

10   from defendant REYES the following day.

11   <u>Overt Act No. 14:</u>   On February 24, 2022, by telephone using

12   coded language, defendant REYES told CI-1 that defendant SARAVIA was

13   prepared to sell the methamphetamine the MS-13 Inmate had agreed to

14   sell to CI-1 the previous day.

15   <u>Overt Act No. 15:</u>   On February 24, 2022, defendant SARAVIA sold

16   approximately 886 grams of methamphetamine to CI-1 for $3,000.

17   <u>Overt Act No. 16:</u>   On March 23, 2022, defendant HURTADO sent

18   CI-1 a text message containing a phone number so CI-1 could send

19   defendant HURTADO payment for the February 24, 2022, drug deal via

20   Zelle.

21   <u>Overt Act No. 17:</u>   On March 23, 2022, defendant HURTADO sent

22   CI-1 a text message acknowledging receipt of the money CI-1 sent

23   defendant HURTADO via Zelle as payment for the February 24, 2022,

24   drug deal.

25   <u>Overt Act No. 18:</u>   On April 6, 2022, by text message using

26   coded language, defendant SARAVIA told CI-1 he was prepared to sell

27   methamphetamine to CI-1 on behalf of the MS-13 Inmate.

28

1      Overt Act No. 19:  On April 6, 2022, defendant SARAVIA sold

2  approximately 869 grams of methamphetamine to CI-1 for $2,600.

3      Overt Act No. 20:  On May 11, 2022, by text message using coded

4  language, defendant HURTADO agreed to contact the MS-13 Inmate on

5  behalf of CI-1 and inform the MS-13 Inmate that CI-1 wanted to buy

6  two pounds of methamphetamine.

7      Overt Act No. 21:  On May 11, 2022, by voice message using

8  coded language, defendant HURTADO informed CI-1 that the MS-13 Inmate

9  had two pounds of methamphetamine available for sale and CI-1 should

10  contact defendant BARRIENTOS to finalize the purchase of the

11  methamphetamine.

12      Overt Act No. 22:  On May 17, 2022, by voice message and text

13  message using coded language, defendant HURTADO informed CI-1 that

14  defendant BARRIENTOS was prepared to sell two pounds of

15  methamphetamine to CI-1 and provided CI-1 with defendant BARRIENTOS's

16  phone number.

17      Overt Act No. 23:  On May 17, 2022, by text message using coded

18  language, defendant HURTADO informed CI-1 that the MS-13 Inmate had

19  agreed to sell two pounds of methamphetamine to CI-1 for $1,300 per

20  pound.

21      Overt Act No. 24:  On May 18, 2022, by telephone using coded

22  language, defendant BARRIENTOS told CI-1 that the MS-13 Inmate

23  instructed defendant BARRIENTOS to sell methamphetamine to CI-1 at

24  $1,200 per pound and that defendant BARRIENTOS was ready to sell

25  methamphetamine to CI-1.

26      Overt Act No. 25:  On May 18, 2022, defendant BARRIENTOS sold

27  approximately 870.8 grams of methamphetamine to CI-1 for $2,400.

28

Overt Act No. 26:    On May 18, 2022, by telephone using coded language, defendant HURTADO told CI-1 that he had several ounces of methamphetamine for sale and asked CI-1 to buy some of those ounces.

Overt Act No. 27:    On June 8, 2022, by telephone using coded language, defendant HURTADO agreed to sell four ounces of methamphetamine to CI-1.

Overt Act No. 28:    On June 8, 2022, by text message using coded language, defendant GRIJALVA sent CI-1 two addresses where defendant GRIJALVA said he could meet CI-1 to sell the methamphetamine defendant HURTADO promised to CI-1.

Overt Act No. 29:    On June 9, 2022, defendant GRIJALVA sold approximately 109.4 grams of methamphetamine to CI-1 for $500.

Overt Act No. 30:    On June 15, 2022, defendant TORRES-MIRANDA sold approximately 69.5 grams of methamphetamine and a shotgun to a different confidential informant working at the direction of law enforcement ("CI-2") for $1,100.

Overt Act No. 31:    On June 18, 2022, by text message using coded language, defendant HURTADO agreed to sell three ounces of methamphetamine to CI-1 for $300.

Overt Act No. 32:    On June 22, 2022, defendant TORRES-MIRANDA sold approximately 53.7 grams of methamphetamine to CI-2 for $400.

Overt Act No. 33:    On June 28, 2022, by text message using coded language, defendant SARAVIA told CI-1 that he was prepared to sell methamphetamine to CI-1 the following day.

Overt Act No. 34:    On June 29, 2022, defendant SARAVIA sold approximately 870.8 grams of methamphetamine to CI-1 for $2,000.

Overt Act No. 35:    On June 29, 2022, defendant GONZALEZ sold approximately 81.9 grams of methamphetamine to CI-1 for $300.

15

1    <u>Overt Act No. 36:</u>   On July 9, 2022, by text message using coded

2  language, defendant HURTADO told CI-1 that he had methamphetamine

3  available for purchase.

4    <u>Overt Act No. 37:</u>   On July 13, 2022, by telephone and text

5  message using coded language, defendant GRIJALVA agreed to sell three

6  ounces of methamphetamine to CI-1 for $300.

7    <u>Overt Act No. 38:</u>   On July 19, 2022, by telephone using coded

8  language, defendant LINARES agreed to sell two ounces of

9  methamphetamine to CI-1 for $300.

10    <u>Overt Act No. 39:</u>   On July 20, 2022, defendants LINARES and

11  ARREDONDO sold approximately 53.9 grams of methamphetamine to CI-1

12  for $300.

13    <u>Overt Act No. 40:</u>   On July 20, 2022, defendant GRIJALVA sold

14  approximately 81.8 grams of methamphetamine to CI-1 for $300.

15    <u>Overt Act No. 41:</u>   On August 15, 2022, by telephone and text

16  message using coded language, defendant HURTADO agreed to sell three

17  ounces of methamphetamine to CI-1 for $300 in a deal that would be

18  completed with defendant GRIJALVA.

19    <u>Overt Act No. 42:</u>   On August 17, 2022, by telephone using coded

20  language, defendant BARRIENTOS told CI-1 that he was prepared to sell

21  two pounds of methamphetamine to CI-1 for $2,000.

22    <u>Overt Act No. 43:</u>   On August 17, 2022, defendants GRIJALVA and

23  TORRES sold approximately 81 grams of methamphetamine to CI-1 for

24  $300.

25    <u>Overt Act No. 44:</u>   On August 17, 2022, defendant BARRIENTOS

26  sold approximately 866 grams of methamphetamine to CI-1 for $2,000.

27

28

1      <u>Overt Act No. 45:</u>   On August 24, 2022, by telephone using coded

2 language, defendant OLIVAR-MARTINEZ agreed to sell four ounces of

3 methamphetamine to CI-2 for $800.

4      <u>Overt Act No. 46:</u>   On August 24, 2022, defendant OLIVAR-

5 MARTINEZ sold approximately 99.6 grams of methamphetamine to CI-2 for

6 $800.

7      <u>Overt Act No. 47:</u>   On August 29, 2022, by text message using

8 coded language, defendant AQUINO-MARTINEZ requested that defendant

9 ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by

10 defendant ARRONIZ's clique for the previous month.

11      <u>Overt Act No. 48:</u>   On September 7, 2022, by telephone using

12 coded language, defendant OLIVAR-MARTINEZ agreed to sell four ounces

13 of methamphetamine to CI-2 for $800.

14      <u>Overt Act No. 49:</u>   On September 8, 2022, defendant OLIVAR-

15 MARTINEZ sold approximately 99.7 grams of methamphetamine to CI-2 for

16 $800.

17      <u>Overt Act No. 50:</u>   On September 20, 2022, by telephone and text

18 message using coded language, defendant LINARES agreed to sell four

19 ounces of methamphetamine to CI-1 for $400.

20      <u>Overt Act No. 51:</u>   On September 21, 2022, defendant LINARES

21 sold approximately 109.2 grams of methamphetamine to CI-1 for $400.

22      <u>Overt Act No. 52:</u>   On October 3, 2022, by telephone using coded

23 language, defendant BARRIENTOS agreed to sell a pound of

24 methamphetamine to CI-1.

25      <u>Overt Act No. 53:</u>   On October 4, 2022, by telephone using coded

26 language, defendant BARRIENTOS told CI-1 that the price for a pound

27 of methamphetamine was $1,000.

28

1   <u>Overt Act No. 54:</u>   On October 5, 2022, defendant BARRIENTOS

2   sold approximately 430 grams of methamphetamine to CI-1 for $1,000.

3   <u>Overt Act No. 55:</u>   On October 29, 2022, by text message using

4   coded language, defendant AQUINO-MARTINEZ requested that defendant

5   ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by

6   defendant ARRONIZ's clique for the previous month.

7   <u>Overt Act No. 56:</u>   On November 20, 2022, by telephone using

8   coded language, defendant VALLADARES agreed to sell three ounces of

9   methamphetamine to CI-1 in two deals, one with defendant GODINEZ-

10  CAMPOS and a second one with defendant VALLADARES.

11  <u>Overt Act No. 57:</u>   On November 21, 2022, defendant GODINEZ-

12  CAMPOS sold approximately 53.2 grams of methamphetamine to CI-1 for

13  $250.

14  <u>Overt Act No. 58:</u>   On November 21, 2022, defendant VALLADARES

15  sold approximately 27.2 grams of methamphetamine to CI-1 for $125.

16  <u>Overt Act No. 59:</u>   On November 28, 2022, by text message using

17  coded language, defendant AQUINO-MARTINEZ requested that defendant

18  ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by

19  defendant ARRONIZ's clique for the previous month.

20  <u>Overt Act No. 60:</u>   On December 5, 2022, by text message using

21  coded language, defendant ARREDONDO agreed to sell three ounces of

22  methamphetamine to CI-1.

23  <u>Overt Act No. 61:</u>   On December 7, 2022, defendant ARREDONDO

24  sold approximately 82.2 grams of methamphetamine to CI-1 for $420.

25  <u>Overt Act No. 62:</u>   On December 7, 2022, by telephone and text

26  message using coded language, defendant BARRIENTOS agreed to sell one

27  pound of methamphetamine to CI-1 for $800.

28

1    Overt Act No. 63:   On December 7, 2022, defendant BARRIENTOS

2  sold approximately 430 grams of methamphetamine to CI-1 for $800.

3    Overt Act No. 64:   On December 19, 2022, by telephone using

4  coded language, defendant ARRONIZ agreed to sell four ounces of

5  methamphetamine to CI-2 for $800.

6    Overt Act No. 65:   On December 20, 2022, defendant ARRONIZ sold

7  approximately 106.7 grams of methamphetamine to CI-2 for $800.

8    Overt Act No. 66:   On December 30, 2022, by text message using

9  coded language, defendant AQUINO-MARTINEZ requested that defendant

10  ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by

11  defendant ARRONIZ's clique for the previous month.

12    Overt Act No. 67:   On January 12, 2023, by telephone using

13  coded language, defendant BARRIENTOS agreed to sell one pound of

14  methamphetamine to CI-1 for $800.

15    Overt Act No. 68:   On January 12, 2023, defendant BARRIENTOS

16  sold approximately 437 grams of methamphetamine to CI-1 for $800.

17    Overt Act No. 69:   On January 20, 2023, by text message using

18  coded language, defendant AQUINO-MARTINEZ requested that defendant

19  ARRONIZ pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by

20  defendant ARRONIZ's clique for the previous month.

21    Overt Act No. 70:   On January 24, 2023, defendant ARRONIZ sold

22  approximately 110.7 grams of methamphetamine to CI-2 for $800.

23    Overt Act No. 71:   On February 9, 2023, by telephone using

24  coded language, defendant ABARCA told CI-1 that he contacted

25  defendant GRIJALVA on CI-1's behalf and told defendant GRIJALVA that

26  CI-1 wanted to buy three ounces of methamphetamine.

27

28

19

Overt Act No. 72:    On February 12, 2023, by telephone using coded language, defendant GRIJALVA agreed to sell three ounces of methamphetamine to CI-1 for $330.

Overt Act No. 73:    On February 13, 2023, in a telephone call using coded language, defendant ABARCA agreed to accept $30 from CI-1 as payment for coordinating defendant GRIJALVA's sale of methamphetamine to CI-1.

Overt Act No. 74:    On February 13, 2023, defendant GRIJALVA sold approximately 82.6 grams of methamphetamine to CI-1 for $330.

Overt Act No. 75:    On February 26, 2023, by telephone using coded language, defendant MENDOZA agreed to sell three ounces of methamphetamine to CI-1 for $450.

Overt Act No. 76:    On February 27 and 28, 2023, by telephone using coded language, defendant VALLADARES agreed to sell three ounces of methamphetamine to CI-1.

Overt Act No. 77:    On February 28, 2023, by telephone using coded language, defendant VALLADARES confirmed to CI-1 that the price for three ounces of methamphetamine was $390.

Overt Act No. 78:    On February 28, 2023, defendant VALLADARES sold approximately 84.5 grams of methamphetamine to CI-1 for $390.

Overt Act No. 79:    On February 28, 2023, defendant MENDOZA sold approximately 82.8 grams of methamphetamine to CI-1 for $450.

Overt Act No. 80:    On March 18, 2023, by telephone using coded language, defendant MENDOZA agreed to sell four ounces of methamphetamine to CI-1.

Overt Act No. 81:    On March 20, 2023, by telephone using coded language, defendant BARRIENTOS agreed to sell two pounds of methamphetamine to CI-1.

20

<u>Overt Act No. 82:</u>    On March 21, 2023, defendant BARRIENTOS sold approximately 882.2 grams of methamphetamine to CI-1 for $1,000.

<u>Overt Act No. 83:</u>    On March 21, 2023, by telephone using coded language, defendant MENDOZA told CI-1 that the price for four ounces of methamphetamine would be $600.

<u>Overt Act No. 84:</u>    On March 21, 2023, defendant CHAVEZ sold approximately 108.8 grams of methamphetamine to CI-1 for $460.

<u>Overt Act No. 85:</u>    On March 27 and March 28, 2023, by text message using coded language, defendant BARRIENTOS instructed CI-1 to send the remainder of the money for the 882.2 grams of methamphetamine to defendant AQUINO-MARTINEZ.

<u>Overt Act No. 86:</u>    On March 28, 2023, by telephone using code language, defendant AQUINO-MARTINEZ told CI-1 that defendant BARRIENTOS designated defendant AQUINO-MARTINEZ as the recipient of the outstanding amount of money owed by CI-1 to defendant BARRIENTOS for the March 21, 2023, methamphetamine deal.

<u>Overt Act No. 87:</u>    On March 28, 2023, by text message using coded language, defendant AQUINO-MARTINEZ provided CI-1 with a telephone number that CI-1 could use to provide defendant AQUINO-MARTINEZ money via Internet cash transfer application.

<u>Overt Act No. 88:</u>    On April 29, 2023, by telephone using coded language, defendant JACO-VILLALOBOS agreed to sell three ounces of methamphetamine to CI-1.

<u>Overt Act No. 89:</u>    On May 1, 2023, defendant MARTIR agreed to sell three ounces of methamphetamine to CI-1 for $375.

<u>Overt Act No. 90:</u>    On May 2, 2023, defendants GODINEZ-CAMPOS and MARTIR sold approximately 145.4 grams of methamphetamine to CI-1.

1    <u>Overt Act No. 91:</u>    On July 11, 2023, by telephone using coded
2    language, defendant GOMEZ-MEJIA agreed to sell four ounces of
3    methamphetamine to CI-1.
4    <u>Overt Act No. 92:</u>    On July 12, 2023, defendant GOMEZ-MEJIA sold
5    approximately 110.4 grams of methamphetamine to CI-1 for $560.
6    <u>Overt Act No. 93:</u>    On July 31, 2023, by telephone using coded
7    language, defendant HERNANDEZ agreed to sell two ounces of
8    methamphetamine to CI-1 for $260.
9    <u>Overt Act No. 94:</u>    On August 1, 2023, defendant HERNANDEZ sold
10   approximately 55.53 grams of methamphetamine to CI-1 for $260.

COUNT TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT CHINCHILLA]

On or about July 7, 2021, in Los Angeles County, within the Central District of California, defendant BYRON CHINCHILLA, also known as "Psycho," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 786 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT CHINCHILLA]

On or about July 28, 2021, in Los Angeles County, within the Central District of California, defendant BYRON CHINCHILLA, also known as "Psycho," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 863 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SARAVIA]

On or about December 8, 2021, in Los Angeles County, within the Central District of California, defendant CESAR SARAVIA, also known as ("aka") "Sleepy," aka "Washington," knowingly and intentionally distributed at least 50 grams, that is, approximately 877 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS SARAVIA and REYES]

On or about January 6, 2022, in Los Angeles County, within the Central District of California, defendants CESAR SARAVIA, also known as ("aka") "Sleepy," aka "Washington," and JOSE REYES, aka "Husky," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 1.31 kilograms, of methamphetamine, a Schedule II controlled substance.

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS SARAVIA and REYES]

On or about February 24, 2022, in Los Angeles County, within the Central District of California, defendants CESAR SARAVIA, also known as ("aka") "Sleepy," aka "Washington," and JOSE REYES, aka "Husky," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 886 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SARAVIA]

On or about April 6, 2022, in Los Angeles County, within the Central District of California, defendant CESAR SARAVIA, also known as "Sleepy," aka "Washington," knowingly and intentionally distributed at least 50 grams, that is, approximately 869 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS HURTADO and BARRIENTOS]

On or about May 18, 2022, in Los Angeles County, within the Central District of California, defendants PAVEL HURTADO, also known as ("aka") "Temper," and HERLYN BARRIENTOS, aka "Doctorazo," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 870.8 grams, of methamphetamine, a Schedule II controlled substance.

                                    COUNT NINE

       [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

                        [DEFENDANTS HURTADO and GRIJALVA]

       On or about June 9, 2022, in Los Angeles County, within the
Central District of California, defendants PAVEL HURTADO, also known
as ("aka") "Temper," and ELI GRIJALVA, aka "Skinny," each aiding and
abetting the other, knowingly and intentionally distributed at least
50 grams, that is, approximately 109.4 grams, of methamphetamine, a
Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT TORRES-MIRANDA]

On or about June 15, 2022, in Los Angeles County, within the Central District of California, defendant CARLOS TORRES-MIRANDA, also known as "Estricto," aka "Malaspecto," knowingly and intentionally distributed at least 50 grams, that is, approximately 69.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT TORRES-MIRANDA]

On or about June 22, 2022, in Los Angeles County, within the Central District of California, defendant CARLOS TORRES-MIRANDA, also known as "Estricto," aka "Malaspecto," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SARAVIA]

On or about June 29, 2022, in Los Angeles County, within the Central District of California, defendant CESAR SARAVIA, also known as "Sleepy," aka "Washington," knowingly and intentionally distributed at least 50 grams, that is, approximately 870.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS HURTADO, GRIJALVA, and GONZALEZ]

On or about June 29, 2022, in Los Angeles County, within the Central District of California, defendants PAVEL HURTADO, also known as ("aka") "Temper," ELI GRIJALVA, aka "Skinny," and AMILCAR GONZALEZ, aka "Lunatico," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS LINARES and ARREDONDO]

On or about July 20, 2022, in Los Angeles County, within the Central District of California, defendants ELMER LINARES, also known as ("aka") "Macabro, and JOSE ARREDONDO, aka "Misterio," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 53.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS HURTADO and GRIJALVA]

On or about July 20, 2022, in Los Angeles County, within the Central District of California, defendants PAVEL HURTADO, also known as ("aka") "Temper," and ELI GRIJALVA, aka "Skinny," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS HURTADO, GRIJALVA, and TORRES]

On or about August 17, 2022, in Los Angeles County, within the Central District of California, defendants PAVEL HURTADO, also known as ("aka") "Temper," ELI GRIJALVA, aka "Skinny," and DOUGLAS TORRES, aka "Midnight," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about August 17, 2022, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo" knowingly and intentionally distributed at least 50 grams, that is, approximately 866 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT OLIVAR-MARTINEZ]

On or about August 24, 2022, in Los Angeles County, within the Central District of California, defendant ORLANDO OLIVAR-MARTINEZ, also known as "Tacuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 99.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT OLIVAR-MARTINEZ]

On or about September 8, 2022, in Los Angeles County, within the Central District of California, defendant ORLANDO OLIVAR-MARTINEZ, also known as "Tacuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 99.7 grams, of methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

COUNT TWENTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT LINARES]

On or about September 21, 2022, in Los Angeles County, within the Central District of California, defendant ELMER LINARES, also known as "Macabro," knowingly and intentionally distributed at least 50 grams, that is, approximately 109.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about October 5, 2022, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo," knowingly and intentionally distributed at least 50 grams, that is, approximately 430 grams, of methamphetamine, a Schedule II controlled substance.

1                          COUNT TWENTY-TWO

2        [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

3                  [DEFENDANTS VALLADARES and GODINEZ-CAMPOS]

4        On or about November 21, 2022, in Los Angeles County, within the

5   Central District of California, defendants PEDRO VALLADARES, also

6   known as ("aka") "Psycho," and CLIDER GODINEZ-CAMPOS, aka "Jicli,"

7   each aiding and abetting the other, knowingly and intentionally

8   distributed at least 50 grams, that is, approximately 80.4 grams, of

9   methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ARREDONDO]

On or about December 7, 2022, in Los Angeles County, within the Central District of California, defendant JOSE ARREDONDO, also known as "Misterio," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about December 7, 2022, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo," knowingly and intentionally distributed at least 50 grams, that is, approximately 430 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ARRONIZ]

On or about December 20, 2022, in Los Angeles County, within the Central District of California, defendant JUAN ARRONIZ, also known as "Tiny," knowingly and intentionally distributed at least 50 grams, that is, approximately 106.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about January 12, 2023, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo," knowingly and intentionally distributed at least 50 grams, that is, approximately 437 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ARRONIZ]

On or about January 24, 2023, in Los Angeles County, within the Central District of California, defendant JUAN ARRONIZ, also known as "Tiny," knowingly and intentionally distributed at least 50 grams, that is, approximately 110.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS ABARCA and GRIJALVA]

On or about February 13, 2023, in Los Angeles County, within the Central District of California, defendants RIQUELMY ABARCA, also known as ("aka") "Bago," and ELI GRIJALVA, aka "Skinny," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 82.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT VALLADARES]

On or about February 28, 2023, in Los Angeles County, within the Central District of California, defendant PEDRO VALLADARES, also known as "Psycho," knowingly and intentionally distributed at least 50 grams, that is, approximately 84.5 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT THIRTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT MENDOZA]

On or about February 28, 2023, in Los Angeles County, within the Central District of California, defendant ANDERSON MENDOZA, also known as "Cypher," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT BARRIENTOS]

On or about March 21, 2023, in Los Angeles County, within the Central District of California, defendant HERLYN BARRIENTOS, also known as "Doctorazo," knowingly and intentionally distributed at least 50 grams, that is, approximately 882.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANTS MENDOZA and CHAVEZ]

On or about March 21, 2023, in Los Angeles County, within the Central District of California, defendants ANDERSON MENDOZA, also known as ("aka") "Cypher," and MARIA CHAVEZ, aka "Moana," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 108.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS JACO-VILLALOBOS, GODINEZ-CAMPOS, and MARTIR]

On or about May 2, 2023, in Los Angeles County, within the Central District of California, defendants CARLOS JACO-VILLALOBOS, also known as ("aka") "Clavo," CLIDER GODINEZ-CAMPOS, aka "Jicli," and MARTIR, aka "Insolente," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 145.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT GOMEZ-MEJIA]

On or about July 12, 2023, in Los Angeles County, within the Central District of California, defendant EDER GOMEZ-MEJIA, also known as ("aka") "Huero," knowingly and intentionally distributed at least 50 grams, that is, approximately 110.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT HERNANDEZ]

On or about August 1, 2023, in Los Angeles County, within the Central District of California, defendant MARCO HERNANDEZ, also known as ("aka") "Clandestino," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.53 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT THIRTY-SIX

2

[18 U.S.C. § 922(g)(1)]

3

[DEFENDANT TORRES]

4      On or about October 25, 2021, in Los Angeles County, within the

5  Central District of California, defendant DOUGLAS TORRES, also known

6  as "Midnight," knowingly possessed ammunition, namely, four rounds of

7  Prvi Partizan 9mm ammunition, two rounds of Blazer 9mm ammunition,

8  one round of Fiocchi 9mm ammunition, one round of Speer 9mm

9  ammunition, one round of Remington 9mm ammunition, one round of

10 Aguila 9mm ammunition, and one round of Federal Cartridge Company 9mm

11 ammunition, loaded inside a 9mm handgun of unknown manufacture,

12 bearing no make, model, or serial number (also known as a "ghost

13 gun"), in and affecting interstate and foreign commerce.

14     Defendant TORRES possessed such ammunition knowing that he had

15 been previously convicted of a felony crime punishable by a term of

16 imprisonment exceeding one year, namely, Theft and Unlawful Driving

17 or Taking of a Vehicle, in violation of California Vehicle Code

18 Section 10851(a), in the Superior Court of the State of California,

19 County of Los Angeles, case number BA490536, on or about July 16,

20 2021.

21

22

23

24

25

26

27

28

1                    FORFEITURE ALLEGATION ONE

2            [21 U.S.C. § 853; 28 U.S.C. § 2461(c)]

3        1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States of America

5   will seek forfeiture as part of any sentence, pursuant to Title 21,

6   United States Code, Section 853 and Title 28, United States Code,

7   Section 2461(c), in the event of any defendant's conviction of the

8   offenses set forth in Counts One through Thirty-Five of this

9   Indictment.

10       2.   Any defendant so convicted shall forfeit to the United

11  States of America the following:

12            (a)  All right, title and interest in any and all property,

13  real or personal, constituting or derived from, any proceeds which

14  the defendant obtained, directly or indirectly, from any such

15  offense;

16            (b)  All right, title and interest in any and all property,

17  real or personal, used, or intended to be used, in any manner or

18  part, to commit, or to facilitate the commission of any such offense;

19            (c)  To the extent such property is not available for

20  forfeiture, a sum of money equal to the total value of the property

21  described in subparagraphs (a) and (b).

22       3.   Pursuant to Title 21, United States Code, Section 853(p),

23  any defendant so convicted shall forfeit substitute property if, by

24  any act or omission of said defendant, the property described in the

25  preceding paragraph, or any portion thereof: (a) cannot be located

26  upon the exercise of due diligence; (b) has been transferred, sold

27  to, or deposited with a third party; (c) has been placed beyond the

28  jurisdiction of the court; (d) has been substantially diminished in

value; or (e) has been commingled with other property that cannot be
divided without difficulty.

1

2

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

3    1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal

4    Procedure, notice is hereby given that the United States of America

5    will seek forfeiture as part of any sentence, pursuant to Title 18,

6    United States Code, Section 981(a)(1)(C), and Title 28, United States

7    Code, Section 2461(c), in the event of any defendant's conviction of

8    the offenses set forth in any of Counts Thirty-Six through Thirty-

9    Eight of this Indictment.

10    2.    Any defendant so convicted shall forfeit to the United

11    States of America the following:

12        a.    all right, title, and interest in any and all

13    property, real or personal, constituting, or derived from, any

14    proceeds traceable to any of the offenses; and

15        b.    To the extent such property is not available for

16    forfeiture, a sum of money equal to the total value of the property

17    described in subparagraph (a).

18    3.    Pursuant to Title 21, United States Code, Section 853(p),

19    as incorporated by Title 28, United States Code, Section 2461(c), the

20    convicted defendant shall forfeit substitute property, up to the

21    value of the property described in the preceding paragraph if, as the

22    result of any act or omission of said defendant, the property

23    described in the preceding paragraph or any portion thereof (a)

24    cannot be located upon the exercise of due diligence; (b) has been

25    transferred, sold to, or deposited with a third party; (c) has been

26    placed beyond the jurisdiction of the court; (d) has been

27    ///

28

60

1    substantially diminished in value; or (e) has been commingled with
2    other property that cannot be divided without difficulty.
3
4
5                                              A TRUE BILL
6
7                                                   /s/
                                              _____
8                                              Foreperson
9    E. MARTIN ESTRADA
     United States Attorney
10
11
12   MACK E. JENKINS
     Assistant United States Attorney
13   Chief, Criminal Division
14   JOSHUA O. MAUSNER
     Assistant United States Attorney
15   Chief, Violent & Organized Crime
     Section
16
     SHAWN T. ANDREWS
17   Assistant United States Attorney
     Terrorism and Export Crimes
18   Section
19   HAVA MIRELL
     Assistant United States Attorney
20   Violent & Organized Crime Section
21
22
23
24
25
26
27
28
                                61

# EXHIBIT 2

1

2

3

4

5

6

7

```
                    FILED
           CLERK, U.S. DISTRICT COURT

           DEC 11 2024

        CENTRAL DISTRICT OF CALIFORNIA
        BY: _____rsm_____ DEPUTY
```

8              UNITED STATES DISTRICT COURT

9          FOR THE CENTRAL DISTRICT OF CALIFORNIA

10               October 2024 Grand Jury

11   UNITED STATES OF AMERICA,        CR No. 23-00545(A)-AB

12           Plaintiff,               F I R S T
                                      S U P E R S E D I N G
13           v.                       I N D I C T M E N T

14   ELI GRIJALVA,                    [18 U.S.C. § 1962(d): Racketeer
      aka "Skinny,"                   Influenced and Corrupt
15   ORLANDO OLIVAR,                  Organizations Conspiracy; 18
      aka "Tacuba,"                   U.S.C. § 1959(a)(5): Violent Crime
16   CARLOS TORRES-MIRANDA,           in Aid of Racketeering; 18 U.S.C.
      aka "Estricto,"                 §§ 924(c)(1)(A)(i), (iii): Using,
17    aka "Malaspecto,"               Carrying, Possessing, and
     CHRISTOPHER MARTIR,              Discharging a Firearm in
18    aka "Insolente,"                Furtherance of, and During and in
     AMILCAR GONZALEZ,                Relation to, a Crime of Violence;
19    aka "Lunatico,"                 21 U.S.C. § 846: Conspiracy to
     AGUSTIN AQUINO-MARTINEZ,         Possess with Intent to Distribute
20    aka "Chino,"                    and to Distribute Methamphetamine;
     JOSE ARREDONDO,                  21 U.S.C. §§ 841(a)(1),
21    aka "Misterio,"                 (b)(1)(A)(viii): Distribution of
     DOUGLAS TORRES,                  Methamphetamine; 18 U.S.C.
22    aka "Midnight,"                 § 922(g)(1): Felon in Possession
     MARIA CHAVEZ,                    of Ammunition; 18 U.S.C.
23    aka "Moana,"                    § 922(g)(5): Alien in Possession
     MARCO HERNANDEZ,                 of Ammunition; 18 U.S.C. § 1963,
24    aka "Clandestino,"              21 U.S.C. § 853, 18 U.S.C.
     RIQUELMY ABARCA,                 § 924(d)(1), and 28 U.S.C.
25    aka "Bago,"                     § 2461(c): Criminal Forfeiture]
     BYRON CHINCHILLA,
26    aka "Psycho,"
     CRISTIAN MORENO-NAVARRO,
27    aka "Baby Gangster,"
     MIGUEL RODRIGUEZ,
28    aka "Mikey,"

CRISTIAN GOMEZ-BENITEZ,
  aka "Orphan,"
JOSE ALVARADO,
  aka "Big Boy,"
JOSE ORTIZ,
  aka "Toro,"
JONATHAN LIZAMA,
  aka "Sabueso," and
CRISTIAN GOMEZ-PINEDA,
  aka "Diamante,"

         Defendants.

The Grand Jury charges:

                    GENERAL ALLEGATIONS

At times relevant to this First Superseding Indictment:

A.   THE RACKETEERING ENTERPRISE

1.    At all times relevant to this First Superseding Indictment, defendants ELI GRIJALVA, also known as ("aka") "Skinny," ("GRIJALVA"); ORLANDO OLIVAR, aka "Tacuba," ("OLIVAR"); CARLOS TORRES-MIRANDA, aka "Estricto," aka "Malaspecto," ("TORRES-MIRANDA"); AMILCAR GONZALEZ, aka "Lunatico," ("GONZALEZ"); AGUSTIN AQUINO-MARTINEZ, aka "Chino," ("AQUINO-MARTINEZ"); JOSE ARREDONDO, aka "Misterio," ("ARREDONDO"); DOUGLAS TORRES, aka "Midnight" ("TORRES"); RIQUELMY ABARCA, aka "Bago," ("ABARCA"); BYRON CHINCHILLA, aka "Psycho," ("CHINCHILLA") and CRISTIAN MORENO-NAVARRO, aka "Baby Gangster," ("MORENO") (collectively, the "defendants") and Christopher Martir, aka "Insolente" ("Martir"); Maria Chavez, aka "Moana" ("Chavez"); Marco Hernandez, aka "Clandestino" ("Hernandez"); Miguel Rodriguez, aka "Mikey" ("Rodriguez"); Cristian Gomez-Benitez, aka "Orphan" ("Gomez-Benitez"); Jose Alvarado, aka "Big Boy" ("Alvarado"); Jose Ortiz, aka "Toro" ("Ortiz"); Jonathan Lizama, aka "Sabueso" ("Lizama"); and Cristian Gomez-Pineda, aka "Diamante" ("Gomez-Pineda"); and others known and unknown to the Grand Jury,

2

1  were members and associates of the Mara Salvatrucha street gang in

2  Los Angeles, otherwise known as MS-13 (hereinafter referred to as

3  "MS-13"), a criminal organization operating in and around Los

4  Angeles, California, whose members and associates engaged in, among

5  other things, numerous acts of violence and other crimes, including

6  attempted murder, assault with deadly weapons, robbery, extortion,

7  conspiracy to traffic in narcotics, narcotics trafficking, and

8  possessing firearms while prohibited from so doing.  At all times

9  relevant to this First Superseding Indictment, MS-13 operated within

10 the Central District of California and elsewhere.  MS-13, including

11 its leaders, members, and associates, constituted an "enterprise," as

12 defined by Title 18, United States Code, Section 1961(4), that is, a

13 group of individuals associated in fact, although not a legal entity,

14 which was engaged in, and the activities of which affected,

15 interstate and foreign commerce.  The enterprise constituted an

16 ongoing organization whose members and associates functioned as a

17 continuing unit for a common purpose of achieving the objectives of

18 the enterprise.

19 B.   BACKGROUND OF THE RACKETEERING ENTERPRISE

20      2.   Mara Salvatrucha was formed in Los Angeles, California in

21 the mid-1980s by immigrants fleeing the civil war in El Salvador.

22 Once in Los Angeles, they organized themselves into a group called

23 Mara Salvatrucha, which was initially largely composed of Salvadoran

24 immigrants.  "Mara" is a Central American term for gang.  "Salva"

25 refers to El Salvador.  In the 1990s in Los Angeles, Mara Salvatrucha

26 distinguished itself by committing brutal acts of violence against

27 rival gang members and non-gang members.  In the mid-1990s, Mara

28 Salvatrucha became associated with the Mexican Mafia, commonly

3

referred to as "la Eme" (which translates in English to "the M"), and added the number "13" to its name.  The number "13" marks the 13th letter of the alphabet: "M."  Thus, Mara Salvatrucha became MS-13. While MS-13 originated in Los Angeles, over the years, MS-13 spread as its members were deported to El Salvador and because its members traveled to other locations in the United States and abroad.  As a result, in addition to operating in Los Angeles, MS-13 operated nationally and internationally, with more than ten thousand members regularly conducting gang activities in at least ten states and Washington, D.C., and with thousands more conducting gang activities in Central America and Mexico.

3.    MS-13 in Los Angeles, and MS-13 nationally and internationally, were largely comprised of persons from Central America, including El Salvador, Honduras, and Guatemala.  Although each MS-13 locale had a common origin, MS-13 in Los Angeles operated differently in El Salvador, Honduras, Guatemala, and the other states within the United States.  Notwithstanding, clique names in other parts of the United States were named for existing cliques in Los Angeles.  At times, MS-13 members from other geographic locations traveled to Los Angeles to participate in leadership meetings; however, MS-13 in Los Angeles was independent and self-governing, and made its own decisions.  Conversely, MS-13 members in Los Angeles were sometimes called upon to provide input in other parts of the country.  Additionally, MS-13 members in Los Angeles trafficked narcotics from Los Angeles to other parts of the country.

C.    THE ENTERPRISE IN LOS ANGELES, CALIFORNIA

4.    One distinguishing feature about MS-13 in Los Angeles is that it is beholden to the Mexican Mafia, which is a criminal

4

organization that united Hispanic gang members under a single alliance that operates within the California state prison system, the federal prison system, the streets and suburbs of large cities throughout Southern California, and elsewhere.  Members of the Mexican Mafia, commonly referred to as a "Carnal," "Brother," "Big Homie," "Tio" (Spanish for "uncle"), and/or "Padrino" (Spanish for "godfather"), typically come from the ranks of local Southern California Hispanic street gangs, including MS-13.  By controlling the criminal activities occurring within prison facilities, providing protection for imprisoned members and associates of Hispanic gangs, and imposing discipline, often in the form of acts of violence, against both individuals and street gangs who fail to adhere to its directives, the Mexican Mafia has risen to the position where it now exercises control over Hispanic street gangs operating throughout the State of California.  Specifically, its individual members control one or more Hispanic street gangs, which serve as the power base through which the Mexican Mafia members operate their individual criminal enterprises.  In return for its integration into the Mexican Mafia, MS-13 members receive the Mexican Mafia's protection in the neighborhoods and also in prison.

5.  Like all gangs associated with the Mexican Mafia in California, MS-13 is required to pay a specified sum, commonly known as "taxes" or "rent" on a regular basis to a member of the Mexican Mafia.  In Los Angeles, each MS-13 clique or sub-set contributes a portion of its profits, derived primarily from narcotics sales and extortion of street vendors, to the Mexican Mafia.  Each member of an MS-13 clique, whether incarcerated or not, is expected to contribute financially to their clique's rent payment.  In return for the tax

payments, the Mexican Mafia provides protection to all MS-13 members incarcerated in county, state and federal prisons and jails in California.  Additionally, and in exchange for the tax payments, the Mexican Mafia allows MS-13 to sell narcotics in its territories. Finally, the Mexican Mafia ensures that no other gang operates in MS-13's territory or otherwise interferes with MS-13's criminal activities.  Failure of MS-13 to pay its tax to the Mexican Mafia will result in a "green light" on MS-13, that is, a general order from the Mexican Mafia to assault or kill any incarcerated MS-13 member in any facility controlled by the Mexican Mafia.  It is unlikely that MS-13 in Los Angeles could continue to exist if it chose not pay its taxes, tantamount to extortion payments, to the Mexican Mafia.

6.    The Mexican Mafia invites some incarcerated MS-13 members to join its leadership.  In this role, those MS-13 members who are chosen to participate in managerial roles for the Mexican Mafia complete various tasks, including, but not limited to, facilitating the smuggling of narcotics into the prison facilities, carrying out orders of discipline and/or determining who will carry out orders of discipline, representing the Mexican Mafia amongst other leaders of the prison/custodial facility, and ensuring that MS-13 members, and other Hispanic gang members under their control follow the Mexican Mafia's code of conduct.  Additionally, incarcerated MS-13 members may still actively participate in MS-13's activities on the outside, including contributing rent money to their respective cliques, hearing disputes between MS-13 members and cliques, determining and/or agreeing or disagreeing with punishment, and ordering discipline for violating the Mexican Mafia's and MS-13's codes of

6

conduct.  While incarcerated, MS-13 members follow the Mexican Mafia's code of conduct.  Failure to comply with this rule can also result in discipline.

7.  MS-13's regular tax payment to the Mexican Mafia comes from MS-13's cliques and is typically paid by the overall leader(s) of MS-13 or by an MS-13 member designated as the enterprise's "treasurer." MS-13 obtains its regular tax payment from each of MS-13's cliques on a monthly or yearly basis.  MS-13 cliques obtain their payments from their individual members.  MS-13's overall leader(s), its treasurer, and clique leaders are involved in the coordination of tax collection throughout the territory MS-13 controls in Los Angeles. Additionally, each clique leader is responsible for collecting extortion, in the form of gang "dues," from each clique member in order to pay each clique's allotted monthly or yearly extortion payment to the Mexican Mafia.  If a clique member does not pay his/her "dues" to the clique, the clique shot caller will "green light" the delinquent member and punishment will be meted out, usually by violence.

8.  In Los Angeles, MS-13 operates under the "Los Angeles Program," which is distinct from programs in El Salvador, Honduras, Guatemala, and other parts of the United States, whereby its leaders and members make all decisions concerning how and when a new person becomes a member of MS-13, how MS-13 operates, when discipline is meted out, when a clique is responsible for paying its extortionate rent payments, the geographical boundaries of each clique, and the identity of the shot callers and leaders.

9.  MS-13 operated through subsets known as "cliques," which were usually named for a street within a clique's territory, or for

the neighborhood in which the clique operated.  MS-13 had approximately 20 cliques operating in Los Angeles, including, but not limited to, "Adams," "Centrales," "Coronados," "Francis," "Fulton," "Harvard," "Hollywood," "Leeward," "King Boulevard," "Molinos," "Normandie," "Parkview," "Southside," "Tiny Winos," "Travieso," and "Vagos."  Each clique typically had one or more leaders at any given point, commonly referred to as "shot callers," who were responsible for, among other things, managing the narcotics trafficking operation in the clique's territory, collecting extortion payments, directing the day-to-day management of the clique, enforcing MS-13's and the Mexican Mafia's codes of conduct, resolving intra-clique disputes, and representing their respective cliques at the MS-13 general meetings.  At various times throughout this conspiracy, the following defendants were shot callers of MS-13's cliques: defendant GRIJALVA, who for a time was also MS-13's overall leader, and defendant GONZALES for the Centrales clique, defendant OLIVAR for the Coronados clique, defendant TORRES-MIRANDA for the Parkview clique, and Christopher Martir for the Molinos clique.  Shot callers are also responsible for meeting with other clique leaders in order to achieve their common criminal purposes and to resolve disputes between the cliques.

10.  A clique adds new members through an initiation ritual known as "jumping in," during which several existing MS-13 members beat up a prospective MS-13 member for 13 seconds.  Once jumped in, an MS-13 member is expected to participate fully in MS-13's criminal activities.

11.  MS-13 members sometimes signify their membership with tattoos reading "Mara Salvatrucha," "MS," "MS-13," or other

1  variations of the gang's name.  MS-13 members typically refer to

2  other members by their monikers, or nicknames, and often do not know

3  fellow gang members' legal names.

4       12.  MS-13 has a self-imposed code of conduct, which is imposed

5  and enforced to maintain compliance among its members.  MS-13 also

6  adopts and enforces the Mexican Mafia's rules.  MS-13 enforces its

7  rules and promotes discipline among its members by imposing monetary

8  fines and threatening and committing acts of violence against members

9  who break the rules.  This is known as being "courted" or

10 "regulated."  MS-13, through its leadership or individual cliques,

11 can vote for MS-13 members to be disciplined for violating MS-13's or

12 the Mexican Mafia's codes of conduct.  Depending on the severity of

13 the violation, MS-13, through its leadership or individual cliques,

14 will decide whether the violator will receive a beating for 13, 26,

15 or 39 seconds, all factors of 13, and will select at least three to

16 four MS-13 members to administer the beatings, with one member

17 counting aloud the seconds.  Additionally, for even more serious

18 violations of MS-13's or the Mexican Mafia's codes of conduct, MS-13,

19 through its leadership or individual cliques, may vote to introduce

20 weapons into the beatings, to include knives, bats and/or pipes.

21 Once an MS-13 member has been disciplined, the individual cliques may

22 also vote to eject the disciplined member from their cliques.  If a

23 member is voted out of the clique, he/she must be "jumped out" of the

24 clique, which means that member will receive another beating.

25 However, that member may join a different MS-13 clique, if the new

26 clique votes to accept that member.  To join a new clique, that

27 member must be "jumped in," or beaten for a designated period of

28 time, usually 13 seconds.

13.  MS-13 has zero tolerance for members and associates who cooperate with law enforcement.  Once MS-13 has evidence that someone has cooperated with law enforcement, by receiving and reviewing law enforcement reports or videos of interviews, MS-13 issues a "green light" as to that person, which is an order that if any MS-13 member sees the person who is allegedly or actually cooperating with law enforcement, that person is to be killed on sight.

14.  MS-13 members also engage in acts of violence against innocent citizens and rival gang members in its territory. Participation in violent acts increases the respect accorded to members who commit violent acts.  Additionally, commission of violent acts by MS-13 members enhances the gang's overall reputation for violence in the community, resulting in the intimidation of citizens in MS-13's territory.

15.  MS-13 claims territory throughout the City and County of Los Angeles, including areas in all of the Los Angeles Police Department's Bureaus.  Historically and currently, MS-13's territorial strongholds were/are the geographical areas encompassing Rampart, Koreatown, Hollywood, and parts of the San Fernando Valley, including North Hollywood and Van Nuys.  MS-13 members write or paint graffiti in the areas in which they control to identify the area as controlled by MS-13.

16.  MS-13 also controls Lafayette Park located at Wilshire Boulevard and North Hoover Street in Los Angeles, which is controlled by the Coronado clique.  MS-13 members often meet at Lafayette Park to discuss gang business and mete out punishment for violations of MS-13's code of conduct.  Additionally, MS-13 controls approximately one fourth of MacArthur Park, located between S. Park View Street and

S. Alvarado Street, and 6th and 7th Streets, bisected by Wilshire Boulevard.  In the late 1990s, the Mexican Mafia divided MacArthur Park into four sections, to be controlled by four separate gangs, including MS-13.

17.  Narcotics sales provide the bulk of MS-13's profits.  As long as MS-13 pays its tax to the Mexican Mafia, MS-13 members are authorized, exclusively, to sell narcotics in MS-13-controlled territories.  Individual MS-13 members who sell narcotics are often required to provide a portion of their narcotics proceeds to the shot caller of the clique.  This money is used by the shot caller for a variety of purposes, including paying the clique's rent to the overall MS-13 leader and thus the Mexican Mafia, paying legal fees for MS-13 members in need, helping MS-13 members in need in El Salvador and other points abroad, and purchasing weapons that are maintained by the clique in their territory for protection.  If a clique member earns money for the clique by selling drugs or other criminal ventures, and contributes a portion to the shot caller, this money is oftentimes considered their rent contribution to the clique.

18.  MS-13 also derives income from the extortion of street and food vendors who operate in MS-13 controlled territory.  On a clique level, the clique shot caller identifies targets for extortion and coordinates which clique member is authorized to collect extortion from each vendor.  MS-13 extorts both legitimate and illegitimate businesses alike, though MS-13 tends to focus on illegitimate or "grey-market" businesses.  These businesses are often owned or run by illegal immigrants, who rarely report this extortion to law enforcement, despite the threats of violence which accompany the extortion.

11

1  D.    PURPOSES OF THE ENTERPRISE IN LOS ANGELES

2       19.    The purposes of the MS-13 enterprise include, but are not

3  limited to, the following:

4            a.    Enriching members and associates of the Mexican Mafia

5  and MS-13 through criminal activities, including drug sales, gun

6  sales, and extortion, as well as the remittance of proceeds generated

7  as a result of MS-13's criminal activities (referred to as "taxes");

8            b.    Preserving, promoting, and protecting the power,

9  territory, and profits of MS-13 and its members and associates,

10 through threats of violence and actual acts of violence, including

11 robbery, extortion, assault, attempted murder and murder;

12           c.    Exposing and punishing MS-13 members and associates

13 who are perceived to have violated MS-13's and the Mexican Mafia's

14 codes of conduct;

15           d.    Maintaining MS-13's control and authority over its

16 territory, often through threats, intimidation and acts of violence

17 committed against local residents and rival gangs; and

18           e.    Violently retaliating against rival gang members or

19 perceived outsiders who challenge the authority of MS-13 or the

20 Mexican Mafia or who fail to pay debts owed to MS-13 members and

21 associates.

22 E.    THE MEANS AND METHODS OF THE ENTERPRISE IN LOS ANGELES

23      20.    The means and methods by which the defendants and their

24 associates conducted and participated in the conduct of the affairs

25 of MS-13 included the following:

26           a.    Members and associates of the enterprise conspired to

27 commit, attempted, and committed, acts of violence to protect and

28 expand the enterprise's criminal operation, including assault,

                                    12

robbery, and attempted murder, directed against rival gang members, neighborhood residents and visitors, and to violently discipline insubordinate members of the enterprise;

b.    Members and associates of the enterprise acquired, possessed, carried, and used deadly weapons, including firearms, in the course of the criminal enterprise's criminal activities;

c.    Members and associates of the enterprise promoted a climate of fear in the community through threats of harm and violence;

d.    Members and associates of the enterprise participated in narcotics trafficking, including the purchase and sale of controlled substances, and the sale of firearms to generate income;

e.    Members and associates of the enterprise frequently engaged in the aforementioned criminal activity in the presence of other MS-13 gang members and/or associates in order to enhance the status within MS-13 of those affirmatively conducting criminal acts;

f.    Members and associates of the enterprise used various techniques to avoid law enforcement scrutiny of the enterprise's criminal activities and to evade and frustrate law enforcement, such as the use of coded language to discuss criminal activities and other counter-surveillance techniques; and

g.    Members and associates of the enterprise protected and strengthened MS-13's standing by following the direction of the Mexican Mafia leadership; by corresponding with members of MS-13 and the Mexican Mafia through telephone calls and written correspondence; by remitting portions ("taxes") of drug sales and other illegal activities to Mexican Mafia members and associates; and by carrying

out violent acts against targets designated by Mexican Mafia members and associates.

COUNT ONE

[18 U.S.C. § 1962(d)]

[DEFENDANTS GRIJALVA, OLIVAR, TORRES-MIRANDA, GONZALEZ, AQUINO-
MARTINEZ, ARREDONDO, TORRES, ABARCA, CHINCHILLA, and MORENO]

Paragraphs 1 through 20 of the General Allegations of this First
Superseding Indictment are re-alleged and incorporated here.

A.    THE RACKETEERING CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing to
on or about November 8, 2023, in Los Angeles County, within the
Central District of California, and elsewhere, defendants GRIJALVA,
OLIVAR, TORRES-MIRANDA, GONZALEZ, AQUINO-MARTINEZ, ARREDONDO, TORRES,
ABARCA, CHINCHILLA, and MORENO, and others known and unknown to the
Grand Jury, being persons employed by and associated with the MS-13
criminal enterprise, an enterprise which was engaged in, and the
activities of which affected, interstate and foreign commerce,
knowingly and intentionally conspired to violate Title 18, United
States Code, Section 1962(c), that is, to conduct and participate,
directly and indirectly, in the conduct of the affairs of that
enterprise through a pattern of racketeering activity, as that term
is defined in Title 18, United States Code, Sections 1961(1) and
1961(5), consisting of:

1.    Multiple acts involving:

a.    Murder, in violation of California Penal Code Sections
21a, 31, 182, 187, 188, 189, 190, and 664;

b.    Robbery, in violation of California Penal Code
Sections 21a, 31, 182, 211, 212, 212.5, and 664; and

2.    Multiple offenses involving trafficking in controlled substances, including methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and

3.    Multiple acts indictable under Title 18, United States Code, Section 1956 (relating to laundering of monetary instruments).

It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

B.    MANNER AND MEANS BY WHICH THE OBJECT OF THE RACKETEERING CONSPIRACY WAS TO BE ACCOMPLISHED

Among the manner and means used by the defendants and their co-conspirators to achieve the object of the conspiracy were the following:

1.    An incarcerated MS-13 member who was also a member of the Mexican Mafia (the "MS-13 Inmate") would exercise control of MS-13 Los Angeles by designating certain MS-13 members, like defendant GRIJALVA, to be the overall shot caller for MS-13 Los Angeles.  As the overall shot caller, defendant GRIJALVA would oversee MS-13's drug trafficking activities, coordinated the collection and distribution of extortionate taxes, conducted and attended MS-13 meetings, during which defendant GRIJALVA disseminated the MS-13 Inmate's orders to MS-13's general leadership and membership, authorized the "jumping in" of new members and the assault of members who were in bad standing with MS-13, authorized the killing of rival gang members, and communicated with the MS-13 Inmate on behalf of MS-13.

2.    Defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, and GONZALEZ, and co-conspirator Martir and others known and unknown to the Grand

16

Jury, were shot callers of MS-13's cliques and had responsibility over their respective clique's day-to-day activities, including rent collection, narcotics trafficking, witness intimidation, maintaining the clique's firearms, directing violence against members of the community and/or rival gang members, ensuring their clique's rent was paid to the MS-13 Inmate, ordering discipline of clique members who violated MS-13's code of conduct, grooming and developing new MS-13 members, and maintaining and/or expanding his clique's territory.

3.    Additionally, each clique member, including defendants AQUINO-MARTINEZ, ARREDONDO, TORRES, ABARCA, CHINCHILLA, and MORENO, and co-conspirators Hernandez, Rodriguez, Gomez-Benitez, Alvarado, Ortiz, Lizama, and Gomez-Pineda, and others known and unknown to the Grand Jury, would answer to the clique's respective shot caller and would be responsible for, among other things, protecting clique territory, marking or denoting clique territory by affixing graffiti to structures and public property located within clique territory, monitoring street corners for non-MS-13 member narcotics distributors, looking for ways to expand clique territory, and obtaining and maintaining firearms to aid in the protection of clique territory.

4.    Defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, Martir, GONZALEZ, ARREDONDO, TORRES, ABARCA, CHINCHILLA, and MORENO, and co-conspirators Chavez, Hernandez, Rodriguez, Gomez-Benitez, Alvarado, Ortiz, and Lizama, and others known and unknown to the Grand Jury, would possess with intent to distribute, distribute, and facilitate the distribution of narcotics in the territories controlled by MS-13 and elsewhere.

17

5.    Defendants GRIJALVA, ABARCA, MORENO, and GONZALEZ, and others known and unknown to the Grand Jury, would discuss, possess, use, and/or direct others to use firearms in furtherance of acts of violence, including acts involving murder, to enforce the authority of MS-13 and enhance the prestige of MS-13 with the Mexican Mafia.

6.    The MS-13 Inmate would designate certain MS-13 members like defendant AQUINO-MARTINEZ to act as the treasurer for MS-13 Los Angeles.  As treasurer, defendant AQUINO-MARTINEZ would coordinate the collection of the drug proceeds and "taxes" from each MS-13 Los Angeles clique, disguising the source of those funds by depositing them into his bank accounts and forwarding them to the MS-13 Inmate through non-incarcerated proxies in the Central District of California and elsewhere.

C.    OVERT ACTS

On or about the following dates, in furtherance of the conspiracy, and to accomplish the object of the conspiracy, defendants, their co-conspirators, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts, within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1:    On September 27, 2020, defendant TORRES robbed J.L., and during the robbery defendant TORRES told J.L. that defendant TORRES belonged to MS-13.

Overt Act No. 2:    On July 5, 2021, by telephone and text message using coded language, the MS-13 Inmate agreed to sell a confidential informant working at the direction of law enforcement ("CI-1") two pounds of methamphetamine for $3,000 and told CI-1 to

obtain the methamphetamine from a co-conspirator and to deliver payment for the methamphetamine to defendant CHINCHILLA.

Overt Act No. 3:   On July 6, 2021, by telephone using coded language, the MS-13 Inmate told CI-1 that defendant CHINCHILLA was prepared to accept money on behalf of the MS-13 Inmate for the sale of methamphetamine.

Overt Act No. 4:   On July 7, 2021, defendant CHINCHILLA accepted $3,000 from CI-1 as payment for CI-1's purchase of approximately 786 grams of methamphetamine in a deal arranged by the MS-13 Inmate.

Overt Act No. 5:   On July 28, 2021, by telephone and text message using coded language, defendant CHINCHILLA agreed to accept payment on behalf of the MS-13 Inmate for the sale of methamphetamine.

Overt Act No. 6:   On July 28, 2021, defendant CHINCHILLA accepted $3,000 from CI-1 as payment for CI-1's purchase of approximately 863 grams of methamphetamine from a co-conspirator in a deal arranged by the MS-13 Inmate.

Overt Act No. 7:   On October 25, 2021, defendant TORRES sold CI-1 a 9mm handgun of unknown manufacture, bearing no make, model, or serial number (also known as a "ghost gun") loaded with ten rounds of ammunition.

Overt Act No. 8:   On June 8, 2022, by text message using coded language, defendant GRIJALVA sent CI-1 two addresses where defendant GRIJALVA said he could meet CI-1 to sell the methamphetamine that a co-conspirator promised to CI-1.

Overt Act No. 9:   On June 9, 2022, defendant GRIJALVA sold approximately 109.4 grams of methamphetamine to CI-1 for $500.

19

Overt Act No. 10:    On June 15, 2022, defendant TORRES-MIRANDA sold approximately 69.5 grams of methamphetamine and a shotgun to a different confidential informant working at the direction of law enforcement ("CI-2") for $1,100.

Overt Act No. 11:    On June 22, 2022, defendant TORRES-MIRANDA sold approximately 53.7 grams of methamphetamine to CI-2 for $400.

Overt Act No. 12:    On June 29, 2022, defendant GONZALEZ sold approximately 81.9 grams of methamphetamine to CI-1 for $300.

Overt Act No. 13:    On July 13, 2022, by telephone and text message using coded language, defendant GRIJALVA agreed to sell three ounces of methamphetamine to CI-1 for $300.

Overt Act No. 14:    On July 20, 2022, defendant ARREDONDO and a co-conspirator sold approximately 53.9 grams of methamphetamine to CI-1 for $300.

Overt Act No. 15:    On July 20, 2022, defendant GRIJALVA sold approximately 81.8 grams of methamphetamine to CI-1 for $300.

Overt Act No. 16:    On August 15, 2022, by telephone and text message using coded language, a co-conspirator agreed to sell three ounces of methamphetamine to CI-1 for $300 in a deal that would be completed with defendant GRIJALVA.

Overt Act No. 17:    On August 17, 2022, defendants GRIJALVA and TORRES sold approximately 81 grams of methamphetamine to CI-1 for $300.

Overt Act No. 18:    On August 24, 2022, by telephone using coded language, defendant OLIVAR agreed to sell four ounces of methamphetamine to CI-2 for $800.

Overt Act No. 19:    On August 24, 2022, defendant OLIVAR sold approximately 99.6 grams of methamphetamine to CI-2 for $800.

20

Overt Act No. 20:  On August 29, 2022, by text message using coded language, defendant AQUINO-MARTINEZ requested that a co-conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by the co-conspirator's clique for the previous month.

Overt Act No. 21:  On September 7, 2022, by telephone using coded language, defendant OLIVAR agreed to sell four ounces of methamphetamine to CI-2 for $800.

Overt Act No. 22:  On September 8, 2022, defendant OLIVAR sold approximately 99.7 grams of methamphetamine to CI-2 for $800.

Overt Act No. 23:  On October 29, 2022, by text message using coded language, defendant AQUINO-MARTINEZ requested that a co-conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed by the co-conspirator's clique for the previous month.

Overt Act No. 24:  On November 5, 2022, at the direction of the MS-13 Inmate, defendant GRIJALVA contacted defendants ABARCA, MORENO, and GONZALEZ and ordered them to murder A.A.

Overt Act No. 25:  On November 6, 2022, defendants ABARCA and MORENO attempted to murder A.A. by shooting him in front of his home in La Puente, California.

Overt Act No. 26:  On November 6, 2022, defendants ABARCA, MORENO, GONZALEZ, and GRIJALVA met at defendant GRIJALVA's home in Los Angeles where defendant GRIJALVA took the guns used by defendants ABARCA and MORENO in the attempted murder of A.A. and sawed them into pieces.

Overt Act No. 27:  On November 7, 2022, at the direction of the MS-13 Inmate, a co-conspirator paid cash to defendants ABARCA, MORENO, and GONZALEZ as a reward for their participation in the attempted murder of A.A. on November 6, 2022.

21

1      Overt Act No. 28:    On November 7, 2022, at the direction of the

2   MS-13 Inmate, a co-conspirator gave approximately an ounce of drugs

3   to defendant GRIJALVA as a reward for his participation in the

4   attempted murder of A.A. on November 6, 2022.

5      Overt Act No. 29:    On November 28, 2022, by text message using

6   coded language, defendant AQUINO-MARTINEZ requested that a co-

7   conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed

8   by the co-conspirator's clique for the previous month.

9      Overt Act No. 30:    On December 5, 2022, by text message using

10   coded language, defendant ARREDONDO agreed to sell three ounces of

11   methamphetamine to CI-1.

12      Overt Act No. 31:    On December 7, 2022, defendant ARREDONDO

13   sold approximately 82.2 grams of methamphetamine to CI-1 for $420.

14      Overt Act No. 32:    On December 30, 2022, by text message using

15   coded language, defendant AQUINO-MARTINEZ requested that a co-

16   conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed

17   by the co-conspirator's clique for the previous month.

18      Overt Act No. 33:    On January 20, 2023, by text message using

19   coded language, defendant AQUINO-MARTINEZ requested that a co-

20   conspirator pay defendant AQUINO-MARTINEZ the drug proceed taxes owed

21   by the co-conspirator's clique for the previous month.

22      Overt Act No. 34:    On February 9, 2023, by telephone using

23   coded language, defendant ABARCA told CI-1 that he contacted

24   defendant GRIJALVA on CI-1's behalf and told defendant GRIJALVA that

25   CI-1 wanted to buy three ounces of methamphetamine.

26      Overt Act No. 35:    On February 12, 2023, by telephone using

27   coded language, defendant GRIJALVA agreed to sell three ounces of

28   methamphetamine to CI-1 for $330.

1    <u>Overt Act No. 36:</u>   On February 13, 2023, in a telephone call

2    using coded language, defendant ABARCA agreed to accept $30 from CI-1

3    as payment for coordinating defendant GRIJALVA's sale of

4    methamphetamine to CI-1.

5    <u>Overt Act No. 37:</u>   On February 13, 2023, defendant GRIJALVA

6    sold approximately 82.6 grams of methamphetamine to CI-1 for $330.

7    <u>Overt Act No. 38:</u>   On March 21, 2023, Chavez sold approximately

8    108.8 grams of methamphetamine to CI-1 for $460.

9    <u>Overt Act No. 39:</u>   On March 27 and March 28, 2023, by text

10   message using coded language, a co-conspirator instructed CI-1 to

11   send the remainder of the money for the sale of 882.2 grams of

12   methamphetamine that took place on March 21, 2023, to defendant

13   AQUINO-MARTINEZ.

14   <u>Overt Act No. 40:</u>   On March 28, 2023, by telephone using code

15   language, defendant AQUINO-MARTINEZ told CI-1 that a co-conspirator

16   designated defendant AQUINO-MARTINEZ as the recipient of the

17   outstanding amount of money owed by CI-1 to the co-conspirator for

18   the March 21, 2023, methamphetamine deal.

19   <u>Overt Act No. 41:</u>   On March 28, 2023, by text message using

20   coded language, defendant AQUINO-MARTINEZ provided CI-1 with a

21   telephone number that CI-1 could use to provide defendant AQUINO-

22   MARTINEZ money via Internet cash transfer application.

23   <u>Overt Act No. 42:</u>   On May 1, 2023, Martir agreed to sell three

24   ounces of methamphetamine to CI-1 for $375.

25   <u>Overt Act No. 43:</u>   On May 2, 2023, Martir and a co-conspirator

26   sold approximately 145.4 grams of methamphetamine to CI-1.

27   <u>Overt Act No. 44:</u>   On July 12, 2023, Gomez-Pineda sold CI-1 a

28   9mm handgun of unknown manufacture, bearing no make, model, or serial

number (also known as a "ghost gun") loaded with three rounds of ammunition.

Overt Act No. 45:   On July 31, 2023, by telephone using coded language, Hernandez agreed to sell two ounces of methamphetamine to CI-1 for $260.

Overt Act No. 46:   On August 1, 2023, Hernandez sold approximately 55.53 grams of methamphetamine to CI-1 for $260.

Overt Act No. 47:   On October 2, 2023, by telephone using coded language, defendant MORENO agreed to sell four ounces of methamphetamine to CI-1 for $520.

Overt Act No. 48:   On October 2, 2023, by telephone using coded language, Rodriguez agreed to sell three ounces of methamphetamine to CI-1 for $600.

Overt Act No. 49:   On October 5, 2023, defendant MORENO sold approximately 107 grams of methamphetamine to CI-1 for $520.

Overt Act No. 50:   On October 5, 2023, Rodriguez sold approximately 81.5 grams of methamphetamine to CI-1 for $600.

Overt Act No. 51:   On October 9, 2023, by telephone using coded language, defendant OLIVAR agreed to sell four ounces of methamphetamine to CI-1 for $480.

Overt Act No. 52:   On October 11, 2023, by telephone using coded language, Gomez-Benitez agreed to sell four ounces of methamphetamine to CI-1 for $600.

Overt Act No. 53:   On October 12, 2023, defendant OLIVAR and Ortiz sold approximately 111 grams of methamphetamine to CI-1 for $480.

Overt Act No. 54:   On October 12, 2023, Gomez-Benitez and Alvarado sold approximately 81 grams of methamphetamine to CI-1 for $450.

Overt Act No. 55:   On October 15, 2023, by text message using coded language, Lizama agreed to sell four ounces of methamphetamine to CI-1 for $560.

Overt Act No. 56:   On October 19, 2023, Lizama sold approximately 109.3 grams of methamphetamine to CI-1 for $560.

D.   NOTICE OF SPECIAL ALLEGATIONS

The Grand Jury further alleges that:

7.   Beginning on a date unknown and continuing to on or about November 8, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, GONZALEZ, AQUINO-MARTINEZ, ARREDONDO, TORRES, ABARCA, CHINCHILLA, and MORENO, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally possess with intent to distribute, and distribute, at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A).

8.   On or about November 5, 2022, in Los Angeles County, within the Central District of California, defendants GRIJALVA, GONZALEZ, ABARCA, and MORENO, and others known and unknown to the Grand Jury, conspired to willfully, deliberately, and with premeditation and malice aforethought, murder A.A., in violation of California Penal Code Sections 182, 187, 188, and 189.

9.   On or about November 6, 2022, in Los Angeles County, within the Central District of California, defendants ABARCA and MORENO, and

25

others known and unknown to the Grand Jury, willfully, deliberately, and with premeditation and malice aforethought, unlawfully attempted to murder A.A., in violation of California Penal Code Sections 21a, 31, 187, 188, 189, and 664.

1    COUNT TWO

2    [18 U.S.C. § 1959(a)(5)]

3    [DEFENDANTS GRIJALVA, GONZALEZ, ABARCA, and MORENO]

4    1.    At all times relevant to this First Superseding Indictment,

5    MS-13, as described more particularly in Paragraphs 1 through 20 of

6    the General Allegations, which paragraphs are re-alleged and

7    incorporated here, including its leaders, members, and associates,

8    constituted an enterprise, as that term is defined in Title 18,

9    United States Code, Section 1959(b)(2), that is, a group of

10   individuals associated in fact that engaged in, and the activities of

11   which affected, interstate and foreign commerce.  The enterprise

12   constituted an ongoing organization whose members functioned as a

13   continuing unit for a common purpose of achieving the objectives of

14   the enterprise.

15   2.    At all times relevant to this First Superseding Indictment,

16   MS-13, through its members and associates, engaged in racketeering

17   activity, as defined in Title 18, United States Code, Sections

18   1959(b)(1) and 1961(1), that is:

19        a.    Multiple acts involving:

20             i.    Murder, in violation of California Penal Code

21   Sections 21a, 31, 182, 187, 188, 189, 190, and 664; and

22             ii.   Robbery, in violation of California Penal Code

23   Sections 21a, 31, 182, 211, 212, 212.5, and 664; and

24        b.    Multiple offenses involving trafficking in controlled

25   substances, including methamphetamine, in violation of Title 21,

26   United States Code, Sections 841(a)(1) and 846; and

27

28

c.    Multiple acts indictable under Title 18, United States Code, Section 1956(relating to money laundering of monetary instruments).

3.    Beginning on a date unknown and continuing to on or about November 6, 2022, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendants ELI GRIJALVA, also known as ("aka") "Skinny," AMILCAR GONZALEZ, aka "Lunatico," RIQUELMY ABARCA, aka "Bago," CRISTIAN MORENO-NAVARRO, aka "Baby Gangster," and others known and unknown to the Grand Jury, knowingly and willfully conspired to murder A.A., in violation of California Penal Code Sections 182, 187, 188, and 189.

COUNT THREE

[18 U.S.C. §§ 1959(a)(5), 2(a)]

[DEFENDANTS ABARCA AND MORENO]

1.   Paragraphs 1 through 20 of the General Allegations and paragraphs 1 and 2 of Count Two of this First Superseding Indictment are hereby re-alleged and incorporated by reference here.

2.   On or about November 6, 2022, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in MS-13, an enterprise engaged in racketeering activity, defendants RIQUELMY ABARCA, also known as ("aka") "Bago," and CRISTIAN MORENO-NAVARRO, aka "Baby Gangster," each aiding and abetting the other, willfully, deliberately, and with premeditation and malice aforethought, attempted to murder A.A., in violation of California Penal Code Sections 31, 187(a), 188(a)(1), 189(a), and 664(a).

COUNT FOUR

[18 U.S.C. §§ 924(c)(1)(A)(i), (iii), 2(a)]

[DEFENDANTS ABARCA AND MORENO]

On or about November 6, 2022, in Los Angeles County, within the Central District of California, defendants RIQUELMY ABARCA, also known as ("aka") "Bago," and CRISTIAN MORENO-NAVARRO, aka "Baby Gangster," each aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed the firearm in furtherance of, a crime of violence, namely, Attempted Murder in in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(5), as charged in Count Three of this First Superseding Indictment, and, in so doing, discharged the firearm.

COUNT FIVE

[21 U.S.C. § 846]

[GRIJALVA, OLIVAR, TORRES-MIRANDA, MARTIR, GONZALEZ, AQUINO-MARTINEZ, ARREDONDO, TORRES, CHAVEZ, HERNANDEZ, ABARCA, CHINCHILLA, MORENO, RODRIGUEZ, GOMEZ-BENITEZ, ALVARADO, ORTIZ, and LIZAMA]

Paragraphs 1 through 20 of the General Allegations of this First Superseding Indictment are re-alleged and incorporated here.

A.    OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing to on or about November 8, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, MARTIR, GONZALEZ, AQUINO-MARTINEZ, ARREDONDO, TORRES, CHAVEZ, HERNANDEZ, ABARCA, CHINCHILLA, MORENO, RODRIGUEZ, GOMEZ-BENITEZ, ALVARADO, ORTIZ, and LIZAMA, and others known and unknown to the Grand Jury, conspired with each other to knowingly and intentionally possess with intent to distribute, and distribute, at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii).

B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1.    The MS-13 Inmate would impose a rule on all MS-13 Los Angeles cliques that required them to buy methamphetamine for re-distribution from a co-conspirator, and others known and unknown to the Grand Jury, with some profits from that distribution flowing to the MS-13 Inmate.

2.     The MS-13 Inmate would designate certain MS-13 members, like defendant GRIJALVA, to be the overall shot caller for MS-13 Los Angeles.  As the overall shot caller, defendant GRIJALVA would oversee MS-13's drug trafficking activities and communicate with the MS-13 Inmate to coordinate drug trafficking activities for MS-13.

3.     MS-13 members would use violence and intimidation to control narcotics trafficking in territories controlled by MS-13. Narcotics sales would comprise the majority of revenue generated by MS-13.  In order to sell narcotics within MS-13's territory, one must either be an MS-13 member, an associate, or otherwise have permission from, and pay extortionate rent payments to, MS-13.

4.     MS-13 shot callers, including defendants OLIVAR, TORRES-MIRANDA, MARTIR, and GONZALEZ, and others known and unknown to the Grand Jury, would be responsible for the geographic territory under their cliques' respective control.  Within a clique's geographic boundaries, that clique, as controlled by the shot caller, would have exclusive rights to distribute narcotics.  Additionally, shot callers would be responsible for collecting, from MS-13's general members, their clique's extortionate rent payments, the bulk of which would likely be comprised of narcotics profits and proceeds.

5.     Additionally, each clique member, including defendants ARREDONDO, TORRES, HERNANDEZ, ABARCA, CHINCHILLA, MORENO, RODRIGUEZ, GOMEZ-BENITEZ, ALVARADO, ORTIZ, and LIZAMA and others known and unknown to the Grand Jury, would answer to the clique's respective shot caller and would be responsible for, among other things, protecting clique territory, marking or denoting clique territory by affixing graffiti to structures and public property located within clique territory, monitoring street corners for non-MS-13 member

narcotics distributors, looking for ways to expand clique territory, and obtaining and maintaining firearms to aid in the protection of clique territory, all to ensure that his or her clique could exclusively distribute narcotics within clique territory.

6.   Each MS-13 member and associate, along with wholesale narcotics suppliers and street narcotics dealers, would receive authorization from the shot callers to traffic in controlled substances within individual clique territories, and in return, would be required to pay a portion of the drug proceeds, known as a "tax," to his or her respective MS-13 shot caller for the areas in which narcotics were trafficked.

7.   Defendants GRIJALVA, OLIVAR, TORRES-MIRANDA, MARTIR, GONZALEZ, ARREDONDO, TORRES, CHAVEZ, HERNANDEZ, ABARCA, CHINCHILLA, MORENO, RODRIGUEZ, GOMEZ-BENITEZ, ALVARADO, ORTIZ, and LIZAMA, and others known and unknown to the Grand Jury, would possess with intent to distribute, distribute, and facilitate the distribution of narcotics in the territories controlled by MS-13.

8.   The MS-13 Inmate would designate certain MS-13 members like defendant AQUINO-MARTINEZ to act as the treasurer for MS-13 Los Angeles.  As treasurer, defendant AQUINO-MARTINEZ would coordinate the collection of the drug proceeds and "taxes" from each MS-13 Los Angeles clique and was responsible for forwarding those profits and taxes to the MS-13 Inmate.

C.   OVERT ACTS

On or about various dates, in furtherance of the conspiracy, and to accomplish the objects of the conspiracy, defendants, and others known and unknown to the Grand Jury, within the Central District of California, committed various overt acts, including the overt acts

numbered 1 through 56 as set forth in Count One and incorporated by reference here, on or about the dates specified therein.

1                              COUNT SIX

2        [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

3                         [DEFENDANT CHINCHILLA]

4        On or about July 7, 2021, in Los Angeles County, within the

5   Central District of California, defendant BYRON CHINCHILLA, also

6   known as "Psycho," and a co-conspirator, each aiding and abetting the

7   other, knowingly and intentionally distributed at least 50 grams,

8   that is, approximately 786 grams, of methamphetamine, a Schedule II

9   controlled substance.

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT CHINCHILLA]

On or about July 28, 2021, in Los Angeles County, within the Central District of California, defendant BYRON CHINCHILLA, also known as "Psycho," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 863 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT GRIJALVA]

On or about June 9, 2022, in Los Angeles County, within the Central District of California, defendant ELI GRIJALVA, also known as "Skinny," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 109.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT TORRES-MIRANDA]

On or about June 15, 2022, in Los Angeles County, within the Central District of California, defendant CARLOS TORRES-MIRANDA, also known as "Estricto," aka "Malaspecto," knowingly and intentionally distributed at least 50 grams, that is, approximately 69.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT TORRES-MIRANDA]

On or about June 22, 2022, in Los Angeles County, within the
Central District of California, defendant CARLOS TORRES-MIRANDA, also
known as "Estricto," aka "Malaspecto," knowingly and intentionally
distributed at least 50 grams, that is, approximately 53.7 grams, of
methamphetamine, a Schedule II controlled substance.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS GRIJALVA and GONZALEZ]

On or about June 29, 2022, in Los Angeles County, within the Central District of California, defendants ELI GRIJALVA, also known as ("aka") "Skinny," AMILCAR GONZALEZ, aka "Lunatico," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANT ARREDONDO]

On or about July 20, 2022, in Los Angeles County, within the Central District of California, defendants JOSE ARREDONDO, also known as ("aka") "Misterio, and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 53.9 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT THIRTEEN

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

3

[DEFENDANT GRIJALVA]

4     On or about July 20, 2022, in Los Angeles County, within the

5 Central District of California, defendant ELI GRIJALVA, also known as

6 "Skinny," and a co-conspirator, each aiding and abetting the other,

7 knowingly and intentionally distributed at least 50 grams, that is,

8 approximately 81.8 grams, of methamphetamine, a Schedule II

9 controlled substance.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS GRIJALVA and TORRES]

On or about August 17, 2022, in Los Angeles County, within the Central District of California, defendants ELI GRIJALVA, also known as ("aka") "Skinny," and DOUGLAS TORRES, aka "Midnight," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT OLIVAR]

On or about August 24, 2022, in Los Angeles County, within the Central District of California, defendant ORLANDO OLIVAR, also known as "Tacuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 99.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT OLIVAR]

On or about September 8, 2022, in Los Angeles County, within the Central District of California, defendant ORLANDO OLIVAR, also known as "Tacuba," knowingly and intentionally distributed at least 50 grams, that is, approximately 99.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT ARREDONDO]

On or about December 7, 2022, in Los Angeles County, within the Central District of California, defendant JOSE ARREDONDO, also known as "Misterio," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS ABARCA and GRIJALVA]

On or about February 13, 2023, in Los Angeles County, within the Central District of California, defendants RIQUELMY ABARCA, also known as ("aka") "Bago," and ELI GRIJALVA, aka "Skinny," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 82.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT CHAVEZ]

On or about March 21, 2023, in Los Angeles County, within the Central District of California, defendant MARIA CHAVEZ, aka "Moana," and a co-conspirator, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 108.8 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT TWENTY

2        [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

3                        [DEFENDANT MARTIR]

4        On or about May 2, 2023, in Los Angeles County, within the

5   Central District of California, defendant CHRISTOPHER MARTIR, also

6   known as "Insolente," and two co-conspirators, each aiding and

7   abetting the other, knowingly and intentionally distributed at least

8   50 grams, that is, approximately 145.4 grams, of methamphetamine, a

9   Schedule II controlled substance.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

COUNT TWENTY-ONE

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

3

[DEFENDANT HERNANDEZ]

4

On or about August 1, 2023, in Los Angeles County, within the

5 Central District of California, defendant MARCO HERNANDEZ, also known

6 as ("aka") "Clandestino," knowingly and intentionally distributed at

7 least 50 grams, that is, approximately 55.53 grams, of

8 methamphetamine, a Schedule II controlled substance.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

                              COUNT TWENTY-TWO

2

              [21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

3

                            [DEFENDANT MORENO]

4

     On or about October 5, 2023, in Los Angeles County, within the

5

Central District of California, defendant CRISTIAN MORENO-NAVARRO,

6

also known as "Baby Gangster," knowingly and intentionally

7

distributed at least 50 grams, that is, approximately 107 grams, of

8

methamphetamine, a Schedule II controlled substance.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWENTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT RODRIGUEZ]

On or about October 5, 2023, in Los Angeles County, within the Central District of California, defendant MIGUEL RODRIGUEZ, also known as "Mikey," knowingly and intentionally distributed at least 50 grams, that is, approximately 81.5 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS OLIVAR and ORTIZ]

On or about October 12, 2023, in Los Angeles County, within the Central District of California, defendants ORLANDO OLIVAR, also known as ("aka") "Tacuba," and JOSE ORTIZ, aka "Toro," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 111 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

[DEFENDANTS GOMEZ-BENITEZ and ALVARADO]

On or about October 12, 2023, in Los Angeles County, within the Central District of California, defendants CHRISTIAN GOMEZ-BENITEZ, also known as ("aka") "Orphan," and JOSE ALVARADO, aka "Big Boy," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 81 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT LIZAMA]

On or about October 19, 2023, in Los Angeles County, within the Central District of California, defendant JONATHAN LIZAMA, also known as "Sabueso," knowingly and intentionally distributed at least 50 grams, that is, approximately 109.3 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT TWENTY-SEVEN

2

[18 U.S.C. § 922(g)(1)]

3

[DEFENDANT TORRES]

4     On or about October 25, 2021, in Los Angeles County, within the

5 Central District of California, defendant DOUGLAS TORRES, also known

6 as "Midnight," knowingly possessed ammunition, namely, four rounds of

7 Prvi Partizan 9mm ammunition, two rounds of Blazer 9mm ammunition,

8 one round of Fiocchi 9mm ammunition, one round of Speer 9mm

9 ammunition, one round of Remington 9mm ammunition, one round of

10 Aguila 9mm ammunition, and one round of Federal Cartridge Company 9mm

11 ammunition, loaded inside a 9mm handgun of unknown manufacture,

12 bearing no make, model, or serial number (also known as a "ghost

13 gun"), in and affecting interstate and foreign commerce.

14     Defendant TORRES possessed such ammunition knowing that he had

15 been previously convicted of a felony crime punishable by a term of

16 imprisonment exceeding one year, namely, Theft and Unlawful Driving

17 or Taking of a Vehicle, in violation of California Vehicle Code

18 Section 10851(a), in the Superior Court of the State of California,

19 County of Los Angeles, case number BA490536, on or about July 16,

20 2021.

21

22

23

24

25

26

27

28

COUNT TWENTY-EIGHT

[18 U.S.C. § 922(g)(5)]

[DEFENDANT GOMEZ-PINEDA]

On or about July 12, 2023, in Los Angeles County, within the Central District of California, defendant CRISTIAN GOMEZ-PINEDA, who was then an alien illegally and unlawfully in the United States, knowingly possessed ammunition, namely, three rounds of Winchester 9mm ammunition, loaded inside a 9mm handgun of unknown manufacture, bearing no make, model, or serial number (also known as a "ghost gun"), in and affecting interstate and foreign commerce.

1

2

## FORFEITURE ALLEGATION ONE

## [18 U.S.C. § 1963]

3    1.    Paragraphs 1 through 20 of the General Allegations of this

4 First Superseding Indictment are re-alleged and incorporated by

5 reference as though fully set forth herein.

6    2.    The allegations contained in Count One of this First

7 Superseding Indictment are hereby repeated, re-alleged, and

8 incorporated by reference herein as though fully set forth at length

9 for the purpose of alleging forfeiture pursuant to the provisions of

10 Title 18, United States Code, Section 1963.  Pursuant to Rule 32.2,

11 Fed. R. Crim. P., notice is hereby given to the defendants that the

12 United States will seek forfeiture as part of any sentence, in

13 accordance with Title 18, United States Code, Section 1963, in the

14 event of any defendant's conviction under Count One of this First

15 Superseding Indictment.

16    3.    Any and each defendant convicted of Count One of this First

17 Superseding Indictment shall forfeit to the United States:

18         a.    any interest said defendant has acquired or maintained

19 in violation of Title 18, United States Code, Section 1962;

20         b.    any interest in, security of, claim against, or

21 property or contractual right affording a source of influence over,

22 any enterprise which said defendant has established, operated,

23 controlled, conducted, or participated in the conduct of, in

24 violation of Title 18, United States Code, Section 1962; and

25         c.    any property constituting or derived from any proceeds

26 obtained, directly or indirectly, from racketeering activity in

27 violation of Title 18, United States Code, Section 1962.

28

4.    Pursuant to Title 18, United States Code, Section 1963(m), each defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph, if, as the result of any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

5.    Any defendant convicted of Count One of this First Superseding Indictment, and each such defendant, is jointly and severally liable for the forfeiture obligations as alleged above.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 853; 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853 and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in Counts Five through Twenty-Six of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from any such offense;

(b)   All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any such offense;

(c)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.    Pursuant to Title 21, United States Code, Section 853(p), any defendant so convicted shall forfeit substitute property if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in

value; or (e) has been commingled with other property that cannot be divided without difficulty.

1        FORFEITURE ALLEGATION THREE

2        [18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

3    1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 18,

6  United States Code, Section 981(a)(1)(C), and Title 28, United States

7  Code, Section 2461(c), in the event of any defendant's conviction of

8  the offense set forth in any of Counts Twenty-Seven and Twenty-Eight

9  of this First Superseding Indictment.

10    2.    Any defendant so convicted shall forfeit to the United

11  States of America the following:

12        a.    all right, title, and interest in any and all

13  property, real or personal, constituting, or derived from, any

14  proceeds traceable to any of the offenses; and

15        b.    To the extent such property is not available for

16  forfeiture, a sum of money equal to the total value of the property

17  described in subparagraph (a).

18    3.    Pursuant to Title 21, United States Code, Section 853(p),

19  as incorporated by Title 28, United States Code, Section 2461(c),

20  the convicted defendant shall forfeit substitute property, up to the

21  value of the property described in the preceding paragraph if, as

22  the result of any act or omission of said defendant, the property

23  described in the preceding paragraph or any portion thereof (a)

24  cannot be located upon the exercise of due diligence; (b) has been

25  transferred, sold to, or deposited with a third party; (c) has been

26  placed beyond the jurisdiction of the court; (d) has been

27  ///

28

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/ _____
Foreperson

E. MARTIN ESTRADA
United States Attorney

*Lindsey Greer Dotson*

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division

SHAWN T. ANDREWS
Assistant United States Attorney
Terrorism and Export Crimes
Section